Jason Sanders (AZ Bar No. 018600)
DENTONS US LLP
2398 E. Camelback Road, Suite 850
Phoenix, AZ  85016-9007
Telephone: (602) 508-3900
Fax: (602) 955-1002
Email:jason.sanders@dentons.com

Brian P. Maloney (*pro hac vice pending*)
Connor P. Sease (*pro hac vice pending*)
DENTONS COHEN & GRIGSBY P.C.
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
Telephone: (412) 297-4900
Fax: (412) 209-0672
Email:  brian.maloney@dentons.com
Email:  connor.sease@dentons.com

Attorneys for Plaintiff, Valvoline LLC

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Valvoline LLC, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Cloud CM, LLC, | |
| Defendant. | |

Valvoline LLC ("Valvoline"), by and through its undersigned attorneys, files this Complaint against Cloud CM, LLC ("Cloud") alleging as follows:

**PARTIES**

1.     Valvoline is a Delaware limited liability company with its principal place of business at 100 Valvoline Way, Lexington, KY 40509.  Each of Valvoline's members are domiciled in the State of Kentucky and the State of Delaware.

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

1        2.     Cloud is a Delaware limited liability company with its principal place of

2   business at 3101 Cobb Parkway #124, Atlanta, GA 30339.  Upon information and belief,

3   at least one of Cloud's members are domiciled in the state of Georgia and none of Cloud's

4   members are domiciled in the State of Kentucky or the State of Delaware.

5

6                       **JURISDICTION AND VENUE**

7        3.     This Court has subject matter jurisdiction over this action pursuant to 28

8   U.S.C. § 1332(a)(1) because this action involves citizens of different states and the matter

9   in controversy exceeds $75,000, exclusive of interest and costs.

10

11       4.     This Court has personal jurisdiction over Cloud because it has conducted

12  business activities in, maintained sufficient contacts with, and has otherwise caused harm

13  in this forum in a manner sufficient to place it within the personal jurisdiction of this

14  Court, as set forth more fully below.

15

16       5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a

17  substantial part of the events and omissions giving rise to the claims occurred in this

18  district and Cloud is otherwise subject to the Court's jurisdiction in this district.

19

20                      **FACTUAL BACKGROUND**

21  **A.**    **The Parties**

22       6.     A leading worldwide supplier and manufacturer in the automotive repair and

23  maintenance industry, Valvoline is the owner of certain real property located at 1864 E.

24  Baseline Road, Mesa, Arizona, 85204 (the "Property").

25

26       7.     Upon information and belief, Cloud provides commercial construction and

27  facilities maintenance services.

28

Error! Unknown document property name.

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

**B.     The Construction Contract**

8.     On October 26, 2020, Valvoline and Cloud entered into a contract (the "Contract") to construct a "Valvoline Instant Oil Change Facility" on Valvoline's Property (the "Project").  A copy of the Contract is attached as Exhibit 1.

9.     Valvoline retained Cloud as the general contractor for the Project.  (*See* Ex. 1.)

10.     Pursuant to Section 3 of the Contract, Cloud was required to complete the Project as depicted in the Contract's Plans and Specifications (the "Work").  (*Id*. § 3(a).)

11.     In exchange for Cloud undertaking and performing the Work pursuant to the Contract, Valvoline agreed to pay Cloud the sum of $1,422,050.00.  (*Id*. § 7(a).).

12.     Section 16 of the Contract provides, in relevant part, as follows:

> Notwithstanding anything herein to the contrary, . . . should the Contractor fail, neglect or refuse to perform any or all work, or . . . if at any time Owner believes, in its discretion, that the Work is unreasonably delayed for any reason or any of the provisions of this Contract are being willfully violated or executed carelessly, or that the Contractor is acting in bad faith . . . then Owner may notify the Contractor in writing and request that it immediately remedy the deficiency or delay.

(*Id*. § 16(b); 16(e).).

13.     Section 16 of the Contract also provides, in relevant part, as follows:

> If the Contractor has not remedied or commenced action which promptly will remedy the same within forty-eight (48) hours of notice being delivered, then Owner may without prejudice to any other right or remedy terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the Work by whatever method Owner may deem expedient.

- 3 -

DENTONS US LLP
2398 EAST CAMELBACK ROAD, SUITE 850
PHOENIX, ARIZONA 85016-9007
(602) 508-3900

(*Id*. § 16.)

**C.      Cloud's Unreasonable Delays of the Project**

14.     Under the Contract, Cloud agreed that "time is of the essence with respect to Contractor's obligations hereunder."  (*Id*. § 6(a).)

15.     Cloud further agreed that the "Start Date" is defined as "two weeks following the acquisition of permits by Contractor."  (*Id*. § 6(a).)

16.     The Contract defines the "Contract Time" as "such period from the Start Date to the Substantial Completion date, as the same may be amended from time to time." (*Id*. § 6(a).)

17.     Pursuant to the Project Schedule attached to the Contract as Exhibit B, Cloud agreed to complete the Project in 113 calendar days.  (*See id*. § 6(a) and Exhibit B, as attached to the Contract.)

18.     Further, Exhibit C attached to the Contract states: "Proposal based on a **15 week (105 days)** construction schedule."   (emphasis in original) (*See id*. § 6(a) and Exhibit C, as attached to the Contract.)

19.     Accordingly, Cloud agreed to complete the Project in either 105 days or, in the alternative, no more than 113 calendar days.

20.     Cloud acquired the permits to begin construction of the Project on January 14, 2021.

21.     Therefore, the "Start Date" under the Contract was January 28, 2021 ("two weeks following the acquisition of permits by Contractor"), and Cloud agreed to complete

- 4 -

construction of the Project on or before either May 13, 2021 (105 days after the Start Date) or, in the alternative, May 21, 2021 (113 days after the Start Date).

22.     Cloud commenced work on the Project on February 1, 2021.

23.     As of December 3, 2021—more than 300 days since the Start Date—Cloud had completed only approximately 50% of the Work on the Project.

24.     Valvoline never agreed to modify the contractually agreed upon Contract Time for completing the Project.

25.     All or a substantial portion of the delay to the Work is attributable to delays caused by Cloud.

**D.     Cloud's Failure and Refusal to Perform the Work**

26.     The plans for the Project required a concrete slab to be poured to dimensions of 67'-0" by 31'-0" between the foundation walls.

27.     Upon information and belief, Cloud improperly constructed the foundation walls and poured the concrete slab to dimensions of 66'-0" by 30'-2" between the foundation walls.  Further, upon information and belief, the foundation walls were installed in the wrong location.

28.     This resulted in, among other issues, significant remedial work by the concrete contractor, redesign by the Architect, and significant delays to the Project.

29.     Cloud also installed piping for the Project's fire suppression system, whereby portions of pipe improperly crossed through and obstructed the oil change bays.

30.     Cloud improperly constructed the foundation walls such that they were "pitted," requiring remedial work to fill the pits in the walls.

- 5 -

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

Error! Unknown document property name.

31.     Among other construction defects, Cloud installed ventilation stacks in incorrect locations.

32.     Each of these defects caused substantial delays to the Project.

33.     Since September 17, 2021, Cloud has been in possession of revised drawings from the Project Architect, which indicate how to proceed with the Work in light of Cloud's failure to properly pour the concrete slab and failure to accurately locate the foundation walls.

34.     Despite receiving the aforementioned revised drawings, Cloud continued to refuse to proceed with the Work.

**E.     Cloud's Fraudulent Billing Practices**

35.     On May 19, 2021, Cloud submitted Change Order No. 1 to Valvoline, which claimed payment for brick modification.  A copy of Change Order No. 1 is attached hereto as Exhibit 2.  On July 14, 2021, Cloud submitted a Payment Application to Valvoline, which claimed payment for certain materials and supplies that were purportedly necessary for Cloud to complete the Project.  A copy of the July 14, 2021 Payment Application No. 2 is attached hereto as Exhibit 3.

36.     Cloud requested collective payments in the amount of (after withholding of retainage):  (i) $39,240.00 for masonry; (ii) $29,580.30 for doors and windows; and (iii) $11,533.50 for brick modification, for which Cloud represented to Valvoline it purchased certain materials through payment to certain third parties, or would purchase certain materials through payment to such third parties immediately upon receipt of payment from Valvoline (the "Representation").

DENTONS US LLP
2398E East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

- 6 -

Error! Unknown document property name.

37.     Relying on Cloud's Representation, Valvoline paid Cloud a total amount of $80,353.80.

38.     Thereafter, Valvoline inquired regarding the location of the materials and payments to third parties related to the payment in the amount of $80,353.80 and Valvoline confirmed that Cloud failed to make the payments to third parties as promised in Cloud's Representation and all or substantially all of the materials that Cloud indicated would be purchased with the payment of $80,353.80 were never purchased, nor were they in storage on- or off-site of the Project.

39.     Cloud has not reimbursed Valvoline for its payment of $80,353.80.

**F.     Valvoline's Notices of Default & Termination**

40.     On December 3, 2021, Valvoline delivered a Notice of Default to Cloud pursuant to Section 16 of the Contract.  A copy of the Notice of Default is attached as Exhibit 4.

41.     Cloud failed to remedy, or commence any action which may promptly remedy, its defaults thereunder within 48 hours of receipt of the Notice of Default as provided in Section 16 of the Contract.

42.     On December 14, 2021, more than 48 hours after Cloud received the Notice of Default, Valvoline delivered a notice of Termination to Cloud pursuant to Section 16 of the Contract.  A copy of the Notice of Termination is attached as Exhibit 5.

**COUNT I**
**Breach of Contract**

43.     The allegations of paragraph 1 through 42 are hereby incorporated by reference as if set forth fully herein.

- 7 -

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

44. Valvoline and Cloud are parties to the Contract.

45. Pursuant to the Contract, Cloud agreed to complete the Work in accordance with the Plans and Specifications therein.

46. Pursuant to the Contract, Cloud agreed to complete the Project in no more than 113 calendar days.

47. Valvoline has performed all of its obligations under the Contract.

48. Cloud has failed and/or refused to complete the Work under the Contract, which is a material breach thereof.

49. Cloud failed to complete the Project in either 105 days or, in the alternative, no more than 113 calendar days, and has unreasonably delayed completion of the Work under the Contract significantly beyond the agreed-upon completion date, which is a material breach thereof.

50. As a direct result of Cloud's material breaches of the Contract, Valvoline has suffered, and continues to suffer, damages including, but not limited to, the increased cost of completing the Project with another contractor, business losses and lost profits, lost rental value of the Property, financing costs, and other damages.

WHEREFORE, Valvoline respectfully requests that the Court enter judgment in its favor and against Cloud, awarding Valvoline monetary damages in excess of $75,000 according to proof at trial, plus consequential damages, interest, fees, costs and expenses; and granting such other and further relief as the Court deems just and proper.

DENTONS US LLP
2398 EAST CAMELBACK ROAD, SUITE 850
PHOENIX, ARIZONA 85016-9007
(602) 508-3900

- 8 -

DENTONS US LLP
2398 EAST CAMELBACK ROAD, SUITE 850
PHOENIX, ARIZONA 85016-9007
(602) 508-3900

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

51.     The allegations of paragraph 1 through 50 are hereby incorporated by reference as if set forth fully herein.

52.     Valvoline and Cloud are parties to the Contract.

53.     Valvoline had reasonably expected benefits under the Contract that: (i) the Work would be performed in a reasonably timely manner; (ii) Cloud would carry out the Work with proper skill and care and in a good and workmanlike manner; (iii) and Cloud would provide goods, materials, and supplies that were of proper quality and reasonably fit for the purpose of the Project.

54.     The Contract contained an implied covenant prohibiting Cloud from doing anything to prevent Valvoline from receiving the benefits and entitlements of the Contract.   Cloud thus had an implied contractual obligation to act in good faith to accomplish the foregoing.

55.     Cloud breached that obligation by its actions set forth above, including in causing unreasonable delays on the Project, failing and/or refusing to perform the Work, and otherwise acting in a manner that denied Valvoline its reasonably expected benefits of the Contract.

56.     As a direct result of Cloud's breaches of its implied obligations of good faith and fair dealing, Valvoline has suffered, and continues to suffer, damages including, but not limited to, the increased cost of completing the Project with another contractor, business losses and lost profits, lost rental value of the Property, financing costs, and other damages.

- 9 -

WHEREFORE, Valvoline respectfully requests that the Court enter judgment in its favor and against Cloud, awarding Valvoline monetary damages in excess of $75,000 according to proof at trial, plus consequential damages, interest, fees, costs and expenses; and granting such other and further relief as the Court deems just and proper.

**COUNT III**
**Fraud**

57. The allegations of paragraph 1 through 56 are hereby incorporated by reference as if set forth fully herein.

58. Pursuant to Payment Application No. 2 and Change Order No. 1, Cloud represented to Valvoline that certain amounts were due to it from Valvoline.

59. The Representation was material to Valvoline's decision to pay Cloud $80,353.80 because Valvoline would not have paid Cloud the $80,353.80 but for Cloud's Representation.

60. The Representation was false.

61. Cloud knew the Representation was false or otherwise ignored its truth because it knew that it did not make payments to third parties as promised in Cloud's Representation and Cloud further knew that all or substantially all of the materials that Cloud indicated would be purchased with the payment of $80,353.80 were never purchased, nor were they in storage on- or off-site of the Project.

62. By making the Representation, Cloud intended that Valvoline pay to it $80,353.80.

63. In making the Representation, Cloud acted with spite, actual malice, or an intent to defraud Valvoline.

- 10 -

Error! Unknown document property name.

64.     In reliance on the Representation's truth (or unawareness of its falsity), Valvoline made payment to Cloud in the amount of $80,353.80.

65.     Valvoline had a right to rely on the Representation under the Contract.

66.     As a direct result of Cloud's Representation, Valvoline has been damaged in the amount of no less than $80,353.80.

WHEREFORE, Valvoline respectfully requests that the Court enter judgment in its favor and against Cloud, awarding Valvoline monetary damages in excess of $75,000 according to proof at trial, plus punitive damages, consequential damages, interest, fees, costs and expenses; and granting such other and further relief as the Court deems just and proper.

### COUNT IV
### Unjust Enrichment
### (In the Alternative)

67.     The allegations of paragraph 1 through 66 are hereby incorporated by reference as if set forth fully herein.

68.     To the extent that a written agreement between Valvoline and Cloud does not exist or is otherwise invalid—which Valvoline denies—Valvoline alleges in the alternative that Cloud has been unjustly enriched.

69.     Valvoline has paid Cloud approximately $927,661.97 for its Work on the Project.

70.     Cloud has failed to complete the Project, unreasonably delayed the Project, and otherwise refused to perform the Work.

- 11 -

DENTONS US LLP
2398 East Camelback Road, Suite 850
Phoenix, Arizona 85016-9007
(602) 508-3900

DENTONS US LLP
2398 EAST CAMELBACK ROAD, SUITE 850
PHOENIX, ARIZONA 85016-9007
(602) 508-3900

71. As a result of Cloud's failures, Valvoline has been impoverished in the amounts it paid to Cloud, totaling in excess of $75,000.

72. As a result of Cloud's failures, Valvoline has not received the benefit of its bargain.

73. Cloud's enrichment and Valvoline's impoverishment is unjustified.

74. If it is determined that a written agreement between Valvoline and Cloud does not exist, is otherwise invalid, or that Valvoline's breach of contract claim fails as a matter of law—each of which Valvoline denies—Valvoline has no adequate remedy at law.

WHEREFORE, Valvoline respectfully requests that the Court enter judgment in its favor and against Cloud, awarding Valvoline monetary damages in excess of $75,000 according to proof at trial, plus consequential damages, interest, fees, costs and expenses; and granting such other and further relief as the Court deems just and proper.

**General Prayer for Relief**

Valvoline requests that this Court enter judgment in its favor and against Cloud as to all counts of the Complaint:

1. Awarding compensatory, incidental, consequential, and punitive damages in an amount to be proven at trial;

2. Awarding reasonable attorneys' fees pursuant to A.R.S. §§ 12-341 and 12-341.01(A) and/or other applicable law;

3. Awarding costs and expenses incurred herein;

4. Awarding prejudgment interest as provided by law; and

- 12 -

Error! Unknown document property name.

5.      For other and further relief as the Court deems just and appropriate.

**<u>Jury Demand</u>**

Plaintiff demands a trial by jury.

Dated: December 20, 2021

**DENTONS US LLP**

By: _s/Jason Sanders_
Jason Sanders
jason.sanders@dentons.com

**DENTONS COHEN & GRIGSBY P.C.**
Brian P. Maloney (*pro hac vice pending*)
brian.maloney@dentons.com
Connor P. Sease (*pro hac vice pending*)
connor.sease@dentons.com

*Attorneys for Plaintiff, Valvoline LLC*

DENTONS US LLP
2398 EAST CAMELBACK ROAD, SUITE 850
PHOENIX, ARIZONA 85016-9007
(602) 508-3900

- 13 -

**Error! Unknown document property name.**

# EXHIBIT 1

**CONSTRUCTION CONTRACT**

This CONSTRUCTION CONTRACT ("Contract") is made as of the 26th day of October, 2020, by and between Cloud CM, LLC (Construction Management), a Delaware limited liability company, having an address of 3101 Cobb Pkwy, #124, Atlanta, GA 30339 (the "Contractor"), and **VALVOLINE LLC**, a Delaware limited liability company, having an address of 100 Valvoline Way, Lexington, Kentucky 40509 (the "Owner").

**RECITALS:**

WHEREAS, the Owner is the [owner/lessee] of that certain property located in the City of Mesa, County of Maricopa, State of Arizona, with an address of 1864 E. Baseline Road; on which Owner [operates/intends to operate] a "Valvoline Instant Oil Change Facility" (the "Project"); and

WHEREAS, the Owner has retained Greenberg Farrow to prepare certain architectural and engineering drawings, plans and specifications for the Project, a copy of which are attached hereto as EXHIBIT A (as the same may be amended from time to time in accordance herewith, the "Plans and Specifications"); and

WHEREAS, the Owner has agreed to retain the Contractor, and the Contractor has agreed, to perform all work necessary to complete the project depicted in the Plans and Specifications on the terms and conditions set forth herein.

NOW THEREFORE, for and in consideration of good and valuable consideration, the receipt of which is hereby acknowledged, the Contractor and the Owner covenant and agree as follows:

I.    **EXECUTION.**

This Contract shall be signed in duplicate by the Contractor, and signed and witnessed in duplicate by the Owner.  By executing the Contract, the Contractor represents that an authorized representative of the Contractor has become familiar with the local conditions under which the Work (as defined below) is to be performed and correlated its observations with requirements of this Contract.

2.    **CONSTRUCTION SITE DESCRIPTION.**

The construction site is depicted in EXHIBIT A attached hereto. EXHIBIT A may include a survey depicting the site and a site plan depicting the Project as it is intended to appear following completion of the Work by the Contractor.

3.    **SCOPE OF WORK.**

(a)    The Contractor shall furnish and pay for all labor, materials, power, equipment, transportation, and all other items unless otherwise stipulated, necessary to complete the work and complete the Project as depicted in the Plans and Specifications (the "Work").

Where one or more certain materials, trade names, or articles of any certain manufacturer are mentioned in the Plans and Specifications, it is done for the express purpose of establishing a basis for durability, quality and efficiency, and variations from the Plans and Specifications are unacceptable, and other materials may be used only if (i) they are equal in durability, quality and efficiency to those mentioned in the Plans and Specifications and are in harmony with the Work and (ii) the Owner has given its prior written approval of any such variation. Should any work which is not detailed herein be required in order to properly complete the Work to be done hereunder, including any Work reasonably inferable from the Plans and Specifications, the Contractor shall perform all such work as if fully described herein.

(b)     The Contractor or its designated representative shall, during the progress of the Work, be in attendance at the Project site for the purpose of supervising the Work as often and for as long as commercially reasonable.  The Contractor shall carefully study and compare all Plans and Specifications or interpretations thereof.  Unless otherwise specified in the Plans and Specifications, all materials shall be new and both workmanship and materials shall be of good quality.  The Contractor shall, if required, furnish satisfactory evidence to the Owner as to the kind and quality of materials.

(c)     The Contractor shall maintain for Owner one copy of all Plans and Specifications, Contract Addenda, shop drawings, Field Work Orders, Change Orders and other modifications, in good order and marked to record all changes made during construction as applicable for the scope of work of the Project.  No portion of Work requiring a shop drawing or sample submission shall be started until the submission has been approved by Owner in writing.  The Contractor shall be held responsible for all mistakes or errors in shop drawings or samples.

**4.     PERMITS, LICENSES AND FEES.**

The Contractor shall secure all trade permits and licenses necessary for the accomplishment of the Work and shall comply with all local laws and regulations ("Legal Requirements") and, if anything herein contained is at variance with any Legal Requirement, then the Contractor shall immediately notify the Owner and receive written instructions before proceeding with such Work. Prior to Contractor's application for a building permit, it shall secure Owner's written approval of the project value to be used for permit purposes. The building permit and curb cut permit will be issued to the Contractor. The costs of such permits will be Owner's responsibility.  At Owner's option, Owner may obtain any of the licenses or permits

**5.     WARRANTY.**

Contractor guarantees and warrants that the Work shall be in compliance with all Legal Requirements; and that the Work shall be free from defects as determined by Owner.  Any Work not in conformance with this guarantee shall be considered defective ("Defective Work").

(a)     Contractor agrees to repair or replace, at Owner's option, any Defective Work (including, without limitation, materials) for the later of: (i) the minimum time period as

-2-

may be prescribed by local statute, law or regulation whether provided for in the Contract or not, or (ii) a period of one (1) year from Final Completion or correction of all defects and punch-list items to Owner's satisfaction, unless a longer period is stated in the Plans and Specifications (collectively referred to as the "Warranty Period"). If Defective Work is latent, hidden or not normally observable, the Warranty Period shall extend for such period as may be specified under state or local law, and if no such period is specified, then such period shall extend for one (1) year from discovery of such Defective Work by the Owner. Within a reasonable time after written notice of a defect, Contractor shall remedy and repair any defects in materials or workmanship, without expense to Owner, including damage to other work and repair or reimbursement for all damages resulting therefrom.

(b)    The Contractor agrees to meet with Owner and/or Owner's representative within fourteen (14) days of the end of the eleventh month following Final Completion for an inspection of the Work to address any warranty issues. If Contractor fails to meet with Owner within said period, the Warranty Period shall be extended until the parties meet and Contractor has addressed such warranty issues. All deficiencies not caused by Owner, neglect, failure to maintain or normal wear and tear shall be noted, and a list of deficiencies shall be given to Contractor. Contractor agrees to correct all such deficiencies within thirty (30) days after the date of the meeting. If the deficiencies are not corrected, Owner may hire an independent contractor to do the Work and bill the Contractor. Contractor agrees to promptly reimburse Owner for its costs to correct the deficiencies. If any item cannot, with reasonable due diligence, be corrected within thirty (30) days, Contractor agrees to set forth in writing a reasonable schedule for completion of the Work that is acceptable to Owner. If such schedule is not met, Owner may complete the Work and Contractor shall promptly reimburse Owner for its costs to complete the Work.

(c)    Final payment, use of the improvements, or any other act of Owner shall not relieve the Contractor of his responsibility for latent or patent defects, faulty workmanship or materials. Owner agrees to give notice of observed defects with reasonable promptness.

(d)    The Contractor shall have each subcontractor execute and deliver to Owner upon the earlier of (a) Final Completion; or (b) termination of the Contract, a written guarantee covering all work not performed by the Contractor and not guaranteed by any other party. The guarantee shall be for the Warranty Period. All third-party guarantees and warranties for the building materials and mechanical equipment included in the Project, and supplied by the Contractor, if any, such as, but not limited to, roofing system, electrical systems, plumbing systems, all mechanical equipment, the hot water heater, sump pump, H.V.A.C units, exhaust fans, door closures and water softeners and all other equipment and material with a guarantee, shall be delivered to Owner by the Contractor.

6.    **CONTRACT TIME.**

(a)    Attached hereto as EXHIBIT B is a current schedule for the completion of the Work (as the same may be amended from time to time, the "Project Schedule"), which schedule includes a date on which Owner intends to issue a written "Notice to Proceed" with the Work (the date actually set forth in such Notice to Proceed shall be referred to herein as

-3-

the "Start Date", which shall be defined as two weeks following the acquisition of permits by Contractor), and a date on which the Contractor shall achieve Substantial Completion of the Work (such period from the Start Date to the Susbtantial Completion date, as the same may be amended from time to time, the "Contract Time"). Contractor agrees that time is of the essence with respect to Contractor's obligations hereunder. The Contractor shall staff the site and commence Work on the Start Date. If the Work is not commenced by the Contractor on the Start Date, the Owner reserves the right to terminate this Contract without payment of any funds to the Contractor.

(b)     In no event shall Contractor commence the Work prior to receiving a Notice to Proceed. In the event Contractor commences construction without a Notice to Proceed, Owner shall be entitled to the amount of its any damages and expenses related thereto, and the Contractor shall immediately cease the Work.

(c)     Owner may at any time prior to issuing the Notice to Proceed to the Contractor, terminate this Agreement without any obligation to the Contractor.

(d)     Contractor agrees that if Substantial Completion of the Work is not achieved within the Contract Time, Owner will suffer substantial and irreparable damages and lost profits, rents, taxes and other costs which may be difficult to ascertain at this time or at the time of loss. Contractor therefore agrees that Owner shall be entitled to a credit against the Contract Sum for $0.00 per day as liquidated and ascertained damages for every day beyond the time for completion or extended time, as the case may be, during which Contractor's Work shall remain unfinished. Such damages may be deducted by Owner from any monies due Contractor, or Owner may prosecute its claim against Contractor in any court of law or equity. The parties acknowledge and agree that the purpose of this provision is to reimburse Owner for damages that it will incur that are reasonable and probable, and not as a penalty or to obtain a windfall.

(e)     As used herein, the term "Substantial Completion" shall mean that the Work is completed such that Owner determines it may occupy or use the Project and the Work for the use for which it is intended, subject only to the completion of the punch list and the other items required in connection with Final Completion (as defined below).

7.     **PAYMENT.**

(a)     In consideration for the Contractor undertaking and performing the Work to be done hereunder, Owner agrees to pay the Contractor the sum of One Million Four Hundred Twenty-Two Thousand Fifty Dollars ($1,422,050.00) (as the same may be amended from time to time, the "Contract Sum"). Attached hereto as EXHIBIT C is a line item breakdown of the Contract Sum amongst various components of the Work. The Contract Sum includes and Contractor shall pay, all federal, state, and local taxes, including sales taxes, excise taxes, use taxes, retailer's occupational taxes employment taxes, worker's compensation, overhead, and similar taxes.

(b)     Where the Contract Sum is less than $100,000.00 Owner will not make more than two (2) progress payments to the Contractor for the proportionate part of the Work actually

-4-

performed to the date of the progress payment.  The first progress payment may be requested when 50% of the Work is completed, as reasonably determined by Owner, and Owner shall pay 90% of such Contractor's invoice, with the remaining ten percent withheld as retainage by Owner until Substantial Completion has been achieved.  The final progress payment shall be requested within thirty (30) days after Substantial Completion.

(c)      Where the Contract Sum is $100,000.00 or more, Owner will not make more than four (4) progress payments to Contractor for the proportionate part of the Contractor's work actually performed to the date of a request for a progress payment, less the aggregate of all previously approved requests.  The first three progress payments may be requested at twenty-five percent (25%), fifty percent (50%), and ninety percent (90%) of completion of the Work, as reasonably determined by Owner; the final progress payment shall be requested within thirty (30) days after Substantial Completion has been achieved.  Owner will pay no more than ninety (90%) of the amount due Contractor on account of progress payments, with the remaining ten percent withheld as retainage by Owner until Substantial Completion has been achieved.

(d)      All invoices shall be accompanied by such supporting evidence as Owner may require, and shall show separately on their face a breakdown of labor, material costs, freight, if any, and sales tax, if any, covered by such invoice.  Before a progress payment is made, Contractor must deliver to Owner a completed contractor's sworn statement and conditional lien waiver (on such form as is acceptable to Owner and in accordance with local and state law) signed and sworn to by Contractor; and completed conditional lien waiver forms (partial or final as may be applicable) signed and sworn to by all subcontractors and materialmen who furnish any part of the Work.

(e)      Owner's obligations to the Contractor shall be limited to the payment for labor, materials and supervision actually furnished by the Contractor under the terms of this Contract.  All requests for progress payments and final payment shall be submitted to Owner signed by an authorized representative of the Contractor.

(f)      Final payment may be requested when the store is open, all unfinished construction items (*i.e.*, the punch list) completed, and the following items, in form and substance satisfactory to Owner, have been delivered to and approved by Owner (collectively, "<u>Final Completion</u>"):

(i)      a completed form Contractor's sworn statement and conditional final lien waiver signed and sworn to by Contractor and completed conditional final lien waiver forms signed and sworn to by all subcontractors and materialmen who furnish labor and/or materials;

(ii)      written releases (in recordable form) acceptable to Owner from any party that furnished labor, materials or equipment in connection with the Work and who filed liens against the property;

-5-

(iii)    all required guarantees and certifications in accordance with the terms and conditions of this Contract, specifically including but not limited to any asphalt paving certificate (certifying sub-base, base, surface preparation and application), engineer's inspection report (certifying all concrete work to include mix design and reinforcing), roof warranty, and electrical certification;

(iv)    any other affidavit, release, waiver notice, certificate or document that may be required by any governmental authority to permit the full use, occupancy and enjoyment of the demised premises and the improvements constructed by Contractor; and

(v)    an as-built site plan noting all underground utilities and their location and a co-signed set of plans for use on the Premises, and if the Work is new construction, a rebuild or if the outside building dimensions or footprint have changed, an updated as-built site plan in duplicate, along with a binder containing all project related documents such as warranties, permits, photos, shop drawings, equipment information, final inspection reports.

All items required in connection with Final Completion shall be completed and submitted no later than thirty (30) days after the opening of the Project by Owner for business to the public.

(g)    All requests for payment received and approved by Owner will be paid within thirty (30) calendar days after receipt by Owner.  Owner shall in its sole discretion, have the right and option to make any and all payments by checks payable to Contractor and subcontractors and material suppliers jointly.

(h)    If a Legal Requirement requires Owner to withhold certain monies from Contractor for tax purposes, Owner is hereby authorized by Contractor to withhold such payments from each progress payment and forward the same to the proper authority as required by law.

(i)    Contractor shall pay all subcontractors and materialmen in a timely manner so that no claims for mechanic's or materialmen's liens will be filed against the Project.  If Owner receives a notice of a claim to be filed or if a claim is filed against the Project, Owner shall have the right, but not the obligation, after five (5) days written notice to Contractor, to immediately pay the full amount of any such claim or lien directly to the subcontractor or materialmen and deduct the same from the Contract Sum.  Contractor waives any and all claims or causes of action he has or may have against Owner for the payments which are made under this article.  Owner shall have the right and option to require Contractor to provide Owner with a bond or title insurance indemnity acceptable to Owner insuring over a lien in an amount equal to at least one and one half times the amount of any such lien filed or notice of lien, including an amount sufficient to cover Owner's legal fees, interest and increased costs and expenses to enforce this Contract as an alternative to payment by Owner, where Owner is satisfied that a legitimate dispute exists concerning the sums due to a subcontractor or materialmen.  However, Contractor shall promptly defend a claim to

-6-

conclusion in order to avoid long outstanding claims.  By requiring such a bond or title insurance indemnity, Owner waives no rights it has against Contractor to require payment of a lien or to pay a lien itself.

(j)     Contractor must meet with Owner within fourteen (14) days after Substantial Completion of the Work to agree on a formal list of construction deficiencies (called the "punch list").  Owner may withhold from the final progress payment an amount equal to one and one half (1½) times Owner's estimated value of the Work described on the punch list.  Contractor further agrees that all punch list items will be corrected within thirty (30) calendar days after the establishment of the punch list.  If these deficiencies are not corrected within thirty (30) calendar days, Owner may hire an independent contractor to do the Work, and Owner may deduct its costs from the monies retained from Contractor, and/or Owner may bill Contractor for these costs or any shortages in the event the amount withheld is insufficient to complete the Work.  Contractor agrees to pay all costs billed by Owner.  If an item cannot be corrected within thirty (30) calendar days, the reasons therefore shall be explained, in writing, to Owner's satisfaction.  It is agreed that the preparation of a punch list by the parties shall in no way waive or alter any other rights of Owner under the contract, including warrantees or latent defects.

(k)     Notwithstanding any terms of this Contract to the contrary, if Contractor fails to comply with any of the requirements set forth above for the final progress payment, Owner may, at its election, retain the remainder of the Contract Sum or an amount sufficient to protect Owner against any potential or actual outstanding mechanic's or materialmen's lien rights until all requirements for the final progress payment have been satisfied.  If all requirements for the final progress payment have been satisfied, Owner shall release the retainage withheld, less the amount Owner may withhold for setoffs or adjustments under the Contract.  In addition, Owner may withhold payments otherwise due hereunder to such extent as may be necessary in Owner's good faith business judgment to protect Owner and Owner from loss because of:

(i)      Defective Work not remedied;

(ii)     Contractor' breach of any terms or conditions of this Contract;

(iii)    Third party claims relating to Contractor's performance of the Work filed or reasonable evidence indicating the probable filing of such claims, including, but not limited to mechanic's lien claims;

(iv)    Failure of Contractor to make proper payments to contractors or subcontractors or for labor, materials, supplies or equipment;

(v)     Evidence satisfactory to Owner that the Work cannot be completed for the unpaid balance of the Contract Sum;

(vi)    Damage to Owner's property or that of a third party;

-7-

(vii)    Reasonable evidence that the Work will not be completed within the Contract Time;

(viii)   Failure of Contractor to carry out the Work in accordance with this Contract.

When the above grounds for withholding payment are removed to Owner's satisfaction, payment shall be promptly made for amounts withheld by reason thereof. If the Contractor fails to perform its obligations under the Contract and becomes obligated to pay Owner a sum of money which exceeds the amount of money retained by Owner under the terms of this Contract, Notwithstanding any terms contained in this Contract to the contrary, in addition to all remedies available at law or in equity, Owner may, at its option, withhold or deduct the amount of money due from the Contractor under this Contract from the monies Owner may be obligated to pay to the Contractor under any other contract between Owner and Contractor.

(l)  Any undisputed payment not made by Owner within thirty (30) days of the date when due shall bear interest at the rate of 10% per annum.

(m)  Contractor shall provided Owner with a completed form Contractor's sworn statement and unconditional final lien waiver signed and sworn to by Contractor and completed unconditional final lien waiver forms signed and sworn to by all subcontractors and materialmen who furnish labor and/or materials within 30 days of Contractor receiving final payment.

8.    **INDEPENDENT CONTRACTOR / SAFETY / CLEANUP.**

(a)    Contractor is an independent contractor for the performance of all Work undertaken under this Contract and for the accomplishment of the desired result and Owner shall have no control over the method and means of completing the Work, except that the Contractor shall observe all safety rules and regulations established by Owner, shall exercise due care and diligence to protect the Work and to prevent any injury to or death of any person or damage to property. The Contractor shall at all times enforce strict discipline and good order among its employees, and shall not employ on the job any unfit person or anyone not skilled in the work assigned to him.

(b)    The Contractor shall execute and deliver to Owner forms provided by Owner covering the Contractor's Health and Safety Regulations applicable to business operations, the terms and provisions of which are incorporated herein by reference.

(c)    The Contractor shall at all times keep the premises free from accumulation of waste materials caused by its operation. Final clean up shall include cleaning of all glass surfaces. The Contractor shall leave the Work "mopped clean" including pressure washing all exterior site surfaces. Cost for this clean up should be included in the Contract Sum. If the Contractor fails to clean up, the Owner may do so and charge the cost to the Contractor.

9.    **SUBCONTRACTORS.**

(a)    Nothing contained in this Contract shall create any contractual relation between any subcontractor and the Owner.  There shall be no obligation on the part of Owner to pay any sums due any subcontractor.

(b)    Contractor shall pay each subcontractor, upon receipt of payment from Owner, an amount equal to the percentage of completion allowed to the Contractor on account of each subcontractor's work.

(c)    Contractor agrees that it is as fully responsible to the Owner for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by them as it is for the acts and omissions of persons directly employed by it.

(d)    Contractor will require each subcontractor or supplier, to the extent of the Work to be performed by such subcontractor or supplier to (A) be bound to the Contractor by the terms of this Contract, (B) assume toward the Contractor all the obligations and responsibilities that the Contractor assumes toward Owner, and (C) designate Owner as the third party beneficiary of any subcontract.

10.    **USE OF PREMISES.**

The Contractor shall confine its apparatus, storage of materials, and the operation of its workmen to the limits indicated by law, ordinances, permits or direction of Owner and shall not unreasonably permit or allow materials or equipment to accumulate on the premises.  The Contractor shall permit and facilitate the inspection of the Work by Owner at any time and it is agreed that Owner may from time to time furnish additional instruction or drawings necessary for the proper execution of the Work.

11.    **COMPLIANCE WITH LAWS.**

The Work shall be in accordance with the best practice of high quality, first class contractors, in compliance with the Plans and Specifications and all applicable codes, rules, regulations,ordinances, law and statues of local, County, State and Federal authorities, including without limitation, the Federal Social Security Act, the State and Federal Unemployment Insurance Acts, the state workmen's compensation laws, the Wage and Hour Laws, and applicable tax and license laws and regulations of every kind and description, the Occupational Safety and Health Act, including, but not limited to, the Americans with Disabilities Act ("ADA") and Americans with Disabilities Act Guidelines ("ADAAG"), collectively ("Legal Requirements") and without use of asbestos, asbestos-containing materials, or other hazardous materials as defined from time to time by applicable federal or state laws, rules, and regulations. Contractor shall be responsible for becoming familiar with these laws (by consulting such professionals as Contractor deems necessary or appropriate), including any changes thereof, and any associated costs are Contractor's responsibility.  Contractor assumes exclusive liability for the reporting and payment of any on all contributions, fees and taxes required under any Legal Requirements, and to the fullest extent allowed by law shall indemnify, defend and hold Owner harmless for any damages or penalties

-9-

Owner may incur as a result of the failure of the Contractor to comply with such Legal Requirements.

If Contractor knows or should know that the drawings and specifications are at variance with each other or any Legal Requirement, including without limitation any ADA or ADAAG violation or any state or local accessibility requirement that may supercede ADAAG, Contractor shall notify Agent in writing before Work is performed. The adjustment of the Contract Sum due to necessary changes shall be adjusted before proceeding with the Work. If any of the Work is done contrary to any law without such notice, Contractor shall bear all costs required to correct such Work.

## 12.   CHANGES IN THE WORK.

Owner shall have authority to make minor changes in the Work not involving extra cost, but otherwise, except in an emergency endangering life or property, no extra Work or change in the Work shall be made without written order, signed by Owner and accepted by the Contractor. All such changes shall be authorized by a Field Work Order issued by Owner's representative in the field. The Contractor shall do no Work not expressly provided for under this Contract unless and until he receives a signed Field Work Order authorizing such Work. Subsequently, a Change Order shall be submitted and executed in duplicate by the Contractor (on AIA Form G722) and shall be accompanied by a copy of the Field Work Order authorizing that Work. All Change Orders will be paid by Owner upon final completion of the Work and receipt of an invoice from the Contractor. The Contractor shall submit any and all Change Orders no later than thirty (30) days after store opening. Owner will not pay Change Orders received after this date without prior written notification by the Contractor and written consent by Owner.

## 13.   INDEMNIFICATION.

To the fullest extent allowed by law, the Contractor agrees to protect, indemnify, hold harmless and defend Owner and its parent, subsidiaries and related companies, and the officers, directors, employees, workmen, servants and invitees (the "Owner Group"), from and against all losses, damages, demands, claims, suits and other liabilities, including reasonable attorney's fees and other expenses of litigation, because of (i) bodily injury, including death at any time resulting therefrom, and property damage, including loss of use thereof and downtime, directly or indirectly arising out of or relating to the performance or non-performance of the Work by the Contractor and its subcontractors, and their respective employees, workmen, agents, servants, subcontractors and vendors (the "Contractor Group") or the Contractor Group being present on Owner's premises, excepting only bodily injury or property damage caused by the negligence or willful misconduct of Owner; (ii) the Contractor Group's violation of or failure to comply with any applicable law, regulation, rule or order; and (iii) the Contractor Group's infringement of patent, trade secret or proprietary rights of any third party by any device, process or material, unless the same was specified by Owner. The Contractor's agreement to protect, indemnify, hold harmless and defend as set forth in the immediately preceding sentence shall not be negated or reduced by virtue of the Contractor's insurance carrier's denial of insurance coverage for the occurrence or event which is the subject matter of the claim and/or refusal to defend the Contractor Group or Owner Group.

-10-

14.    **INSURANCE.**

Without limiting, negating or reducing the Contractor's undertaking to protect, indemnify, hold harmless, reimburse and defend Owner and other parties as provided in Paragraph 13 hereof, and as part of the consideration for sums paid the Contractor by Owner hereunder, the Contractor shall at its own cost and expense procure and keep in force and effect the insurance listed below with insurance carrier(s) with a Best Insurance Reports rating of "A" or better and a financial size category of "VIII" or higher and otherwise acceptable to Owner. Before commencing any Work, the Contractor shall furnish Owner with Certificates of Insurance on Owner's forms (or a form otherwise acceptable to Owner) attested by a duly authorized representative of the insurance carrier(s) evidencing that the insurance required hereunder is in force and effect, that such insurance provides the names Owner or any other party specificed by Owner, as an additional insured as its interst may appear with a waiver of subrogation, and that the insurance will not be canceled or materially changed without giving to Owner at least thirty (30) days prior written notice (by endorsement if required). In the event the Contractor fails to furnish Owner with acceptable certificates of insurance before the time named in this Contract for commencing Work, Owner shall have the right, but not the obligation, to terminate this Contract.

(a)    **Worker's Compensation and Employer's Liability Insurance.** Contractor and all subcontractors retained by or through the Contractor, and all their employees, workmen, agents, and servants shall comply with all requirements of the worker's or workmen's compensations laws of the state or states or other governmental authority in which the Contractor or any subcontractor retained by or through the Contractor is performing any Work hereunder. In addition, the Contractor shall carry Employer's Liability Insurance covering all operations and Work hereunder in an amount not less than $500,000 per occurrence. All such Worker's Compensation and Employer's Liability Insurance shall expressly provide that all rights of subrogation against Owner are waived.

(b)    **General Liability Insurance and Automobile Insurance** (occurrence form): (1) Commercial General Liability Insurance, including Blanket Contractual Liability, Products and Completed Operations Liability and Broad Form Property Damage, covering all Work hereunder, with limits of not less than $1,000,000 for all liability arising out of injury to or death of one or more persons, in any occurrence/$2,000,000 aggregate, and $1,000,000 for all liability arising out of damage to or destruction of property, including loss of use thereof and downtime, in any one occurrence.$2,000,000 aggregate; (2) Automobile Liability Insurance on all motor vehicles owned, hired, or non-owned, which may be used or connected with any of the Work hereunder, with limits of not less than $1,000,000 for all liability arising out of damage to or destruction of property, including loss of use thereof and downtime, in any one occurrence/$2,000,000 aggregate. The policy or policies providing for such insurance shall be endorsed to specifically include the liability assumed by the Contractor under this Contract in Paragraph 13 above in the amounts shown in this Paragraph 14. In addition, such insurance shall specifically name Owner as an additional insured party and shall be primary to any and all other insurance of Owner with respect to any and all claims and demands which may be made against Owner for bodily injury or death resulting therefrom, including injury to or death to the Contractor and it's employees, workmen, agents and servants and for property damage, including damage to the

-11-

Contractor's property, caused by, or alleged to have been caused by, any act, omission or default, negligent or otherwise, of Owner by reason of operations or work hereunder Such insurance shall specifically provide that it applies separately to each insured against which claim is made or suit is brought, except with respect to the limits of the insurer's liability, and that rights of subrogation against Owner are waived.

(c)    Contractor shall maintain a Completed Value Form, All-Risk, Builder's Risk Insurance Policy, that shall insure all Real Property. "Real Property" is defined as the building structure or any part of the build, structure, materials or Owner's equipment that has been received on the site, including, but not limited to foundations, walls, roofs, all building mechanical equipment, building attachments, fixtures and machinery belonging to and constituting a permanent part thereof.

(d)    Neither the Owner, its agents nor their respective employees will be responsible for any loss or damage caused to the equipment or materials of the Contractor or to any property or articles belonging to the Contractor or its employees or subcontractors, and Contractor waives subrogation against Owner, its agents and their employees.

(e)    The above insurance requirements are minimum requirements and shall not limit the Contractor's liability to Owner in any manner.

(f)    In addition to the above, the Contractor will also satisfy any insurance requirements required by any governmental authority.

(g)    Without limiting the respective obligations of Contractor and its insurer(s) for the performance or nonperformance of each and every subcontractor and supplier participating in the Work, Contractor will cause all subcontractors performing any portion of the Work to comply in each and every respect with the insuring obligations applicable to Contractor under this Article 14 (other than subsection (c)), including providing to Owner properly prepared certificates of insurance, and copies of additional insured and waiver of subrogation endorsements, before commencing any Work, and again prior to the expiration of any required insurance coverage.

15.    **SURETY BONDS.**

Unless specifically waived by Owner, the Contractor shall furnish surety bonds in the amount of the Contract Sum by a company acceptable to Owner covering the faithful performance of all the Contractor's obligations hereunder, including, but not limited to, payment of all sums which become due hereunder, and which satisfies such bond or performance guaranty requirements as may be imposed by a governmental authority for the faithful performance of the contract and satisfaction of all conditions, requirements, laws and regulations imposed by governmental authority, including any legal fees, interest, increased costs and expenses Owner may incur to enforce or complete the contract, in accordance with the Plans and Specifications, and it will provide that the work at all times be free and clear of all liens of workmen, material suppliers, subcontractors, or due to any activity of Contractor. The bond shall name Owner as obligee and the Contractor shall not begin the Work until such bond is furnished to Owner.

-12-

16.    **TERMINATION FOR CAUSE.**

Notwithstanding anything herein to the contrary, if

(a)    relief has been ordered under the Bankruptcy Code with respect to the Contractor, or if the Contractor should make a general assignment for the benefit of its creditors, or if a trustee, receiver, custodian or similar officer should be appointed on account of its insolvency, or

(b)    should the Contractor fail, neglect or refuse to perform any or all work, or

(c)    if a lien has been placed upon or against the work or the real property upon which the Work is situated, or

(d)    the Contractor assigns any monies due or to become due hereunder without the previous written consent of Owner, or

(e)    if at any time Owner believes, in its discretion, that the Work is unreasonably delayed for any reason or any of the provisions of this Contract are being willfully violated or executed carelessly, or that the Contractor is acting in bad faith; or

(f)    if the Work is partially or totally delayed by any labor dispute between the Contractor and its employees or between the Contractor and its employees and any other contractor or subcontractor and their respective employees or any work stoppage or slowdown by the Contractor's employees or any subcontractor or its employees for a period of ten (10) calendar days;

then Owner may notify the Contractor in writing and request that it immediately remedy the deficiency or delay.  If the Contractor has not remedied or commenced action which promptly will remedy the same within forty-eight (48) hours of notice being delivered, then Owner may without prejudice to any other right or remedy terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the Work by whatever method Owner may deem expedient.  In such case, the Contractor shall not be entitled to receive any further payments until the Work is finished and releases or waivers of all liens have been obtained or the applicable statutory time for filing a lien has passed.  If the unpaid balance of the Contract Sum shall exceed the expenses of finishing the Work, including compensation for additional managerial and administrative services, such excess shall be paid to the Contractor.  If such expenses shall exceed such unpaid balances, the Contractor shall pay the difference to Owner within ten (10) days of written demand.

17.    **TERMINATION FOR CONVENIENCE.**

Notwithstanding anything herein to the contrary for its convenience, Owner may, without prejudice to any other right or remedy, terminate the engagement of the Contractor in whole or in part at any time by written notice or telephonic notice (confirmed in writing) to the Contractor

-13-

which notice shall state the extent and effective date of the termination. Upon the giving of such notice, Owner may take possession of the premises and of all materials, tools, and appliances thereon belonging to Owner and finish the Work by whatever method Owner may deem expedient. On the effective date thereof, the Contractor shall (a) stop all Work and place no further orders or subcontracts, (b) terminate work orders and subcontractors outstanding, and (c) take any necessary action to protect property in the Contractor's possession in which Owner has or may acquire an interest. In the event of a termination under this section, Owner shall pay the Contractor for any and all labor, materials and supervision performed to date of termination, but shall not pay any other costs or expenses on Work not performed.

18.   **SUSPENSION.**

(a)     Notwithstanding anything herein to the contrary and for causes including, but not limited to, those set forth in Paragraph 16 above or for Owner's convenience, Owner may suspend labor, supervision and/or materials furnished by the Contractor hereunder in whole or in part at any time by written notice or telephonic notice (confirmed in writing) to the Contractor stating the extent and effective date of such suspension whereupon the Contractor shall suspend the Work to the extent specified. If the suspension is for causes including, but not limited to, the existence of a condition described in Paragraph 16 hereof, such suspension shall continue until such cause or condition ceases to exist or Owner notifies the Contractor to resume performance under this Contract or Owner terminates this Contract in accordance with Paragraph 17 hereof, whichever is the earliest to occur. If suspension is for the convenience of Owner and suspension for such cause continues for thirty (30) consecutive working days, the Contractor shall have the right to terminate this Contract in whole or in part by written notice or telephonic notice (confirmed in writing) to Owner which notice shall state the extent and effective date of the termination. In such event this Contract shall terminate in accordance with the Provisions of Paragraph 17 hereof.

(b)     During the period of suspension, the Contractor shall protect and care for all labor, materials and equipment on hand. If the cost of the labor, supervision and materials to be provided hereunder, made necessary by the suspension, is increased or decreased by the suspension, the Contract Sum will be adjusted as follows: Within five (5) working days after receipt of a written notice of suspension, the Contractor shall give Owner an estimate of the increase or decrease in the cost of the Work resulting from such change, if any, necessary to reasonably compensate the Contractor for such change. If Owner agrees that the estimate is reasonable, Owner shall issue an amendment to this Contract providing for such change in the Contract Sum. If Owner disagrees with the reasonableness of the estimate, it shall give the Contractor written notice of such disagreement within five (5) working days of receipt of the estimate. Owner shall have the right to terminate this Contract in accordance with Paragraph 17 hereof or to negotiate with the Contractor in an attempt to reach agreement as to the amount of such increase or decrease in the cost of such labor, supervision and materials. If Owner and the Contractor cannot mutually agree on such amount within ten (10) working days from the date of Owner's notice of disagreement with the Contractor's original estimate, either party shall have the right to terminate this Contract in whole or in part by written notice to the other party which notice shall state the

-14-

extent and effective date of the termination.  In such event this Contract shall terminate in accordance with the provisions of Paragraph 17 hereof.

**19.      COOPERATION WITH OTHER CONTRACTORS AND OWNER.**

Owner reserves the right to let other contracts in connection with the Work or work related thereto and it is agreed that the Contractor shall cooperate with all other contractors and shall properly coordinate the Work with theirs.  The Contractor shall cooperate fully with Owner in performing the Work and shall not interfere with Owner's operations.

**20.      FORCE MAJEURE.**

If the Contractor shall be delayed at any time in the progress of the Work due to an act or negligence of Owner or any other contractor employed by Owner or by changes in the Work, fire, or other cause beyond the Contractor's control, then the Contract Time shall be extended for such reasonable time as Owner may decide. Claims for extension of time shall be made in writing at the time the delay first occurs, in any event no later than seven (7) days after the delay occurs.  The Owner shall not be held responsible for loss or damage sustained by the Contractor through delay caused by any other contractor, or by abnormal weather conditions, or any other cause beyond the control of the Owner. It is expressly understood and agreed that Contractor's sole remedy for any such delay shall be an increase in the Contract Time, without adjustment to the Contract Sum.

**21.      CONFLICTING PROVISIONS, AMENDMENTS.**

The terms, provisions, covenants, or conditions herein contained shall control in the event of any conflict with any provision, term, covenant or condition in any of the documents attached hereto and made a part hereof, or any work orders, purchase orders, requisitions, or any other forms or documents. This Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral.  It is expressly understood and agreed that all additions to, changes in and amendments to this Contract must be in writing and signed by both parties.

**22.      REPRESENTATIONS.**

The Contractor represents to and covenants with Owner that the Contractor is duly licensed and qualified to do business in the state or states in which the Work is to be performed.

**23.      EQUAL EMPLOYMENT OPPORTUNITY.**

The Contractor shall execute and deliver to Owner forms provided by Owner covering certain Equal Employment Opportunity Provisions and Certification of Nonsegregated Facilities applicable to the Contractor's business and operations, the terms and provisions of each of which are incorporated herein by reference.

**24.      RECORDS.**

-15-

The Contractor shall keep all records required by any law or regulation and all other records requested by Owner.  Owner shall have the right at any time, upon reasonable notice, to inspect the Contractor's books and records either in the field or at the Contractor's home office to the extent necessary to verify that the Contractor's labor costs and any other costs or expenses as set forth on the monthly statements have been calculated in accordance with this Contract.  The Contractor agrees that such books and records shall be maintained for a period of at least three (3) years from the completion date of the Work

**25.    NOTICES.**

All notices required under this Contract shall be in writing and if to Owner, shall be sufficient in all respects if delivered in person or sent by registered or certified mail to:

> VALVOLINE LLC
> 100 VALVOLINE WAY
> LEXINGTON, KY  40509
> ATTN:  CONSTRUCTION MANAGER

and if to the Contractor shall be sufficient in all respects if delivered in person or sent by registered or certified mail to:

> CLOUD CM, LLC (Construction Management)
> 3101 COBB PKWY #124
> ATLANTA, GA 30339

**26.    ASSIGNMENT.**

The Contractor shall not assign this Contract or subcontract the Work as a whole without the prior written consent of Owner nor shall the Contractor assign any monies due or to become due hereunder without the previous written consent of Owner.  Owner shall have the right to assign all of its rights and to delegate all of its duties and obligations under this Contract at any time during the term of the Contract.  Owner shall notify Contractor of the name and address of any assignee.  Subject to the provisions of this Section 26, this Contract is binding upon and shall inure to the benefit of Owner and Contractor and their respective successors and assigns.

**27.    AMENDMENTS.**

No amendment, alteration, modification or waiver of this Contract shall be valid or enforceable unless in writing and duly executed by authorized officers or attorneys-in-fact of the parties sought to be charged.  It is agreed that this Contract shall not be deemed amended, altered or modified by the term of any sales order used by the Contractor or invoice rendered or delivered hereunder and Owner shall not be bound by the terms and provisions of any such sales order or invoice.

**28.    NON-WAIVER / CUMULATIVE REMEDIES.**

-16-

No failure or delay on the part of Owner in exercising any right, power or privilege hereunder and no course of dealing between the Contractor and Owner shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Owner would otherwise have. No notice to or demand on the Contractor in any case shall entitle the contractor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Owner to any other or further action in any circumstances without notice or demand.

**29.    SEVERABILITY OF PROVISIONS.**

If any part of this Contract, or the application of any such provision to any person or in any circumstance is held invalid, the application of such part to any other person or in any other circumstance or other jurisdictions, and the remainder of this Contract, shall not be affected thereby and shall remain in full effect.

**30.    USE OF MARKS AND NAMES.**

Contractor shall not, without the prior written consent of Valvoline, (i) use the tradename, service marks, trademarks or trade dress of Valvoline or of any of its affiliated companies for any purposes, including but not limited to in any advertising, publicity release or sales representation; (ii) reveal the existence of this Contract or the terms or conditions hereof to any person or entity; and (iii) include Valvoline's name in any list of representative clients without Valvoline's express written consent

**31.    HEADINGS.**

Paragraph headings in this Contract are included herein for convenience of reference only and shall not constitute a part of this Contract for any other purpose.

**32.    NO DISCRIMINATION.**

Contractor agrees that in connection with the performance of its obligations under this Agreement, it will not discriminate against any person on the basis of race, gender, age, national origin or any other improper or illegal distinction. Contractor shall fully comply with all laws, codes, ordinances and regulations relating to the employment of minorities and women as employees, contractors and vendors.

**33.    GOVERNING LAW.**

This Contract shall be governed and constructed in accordance with the laws of the state where the Project is located.

-17-

   **IN TESTIMONY WHEREOF, witness the signatures of the Parties hereto the day and year first above written.**

CONTRACTOR:

CLOUD CM, LLC (Construction Management)

By: _____

Title: Manager
_____

OWNER:

VALVOLINE LLC

By: *Brett Holtegel*
_____

Title: Sr. Director: Development & Const.
_____

-18-

EXHIBIT A

PLANS AND SPECIFICATIONS

(SEE ATTACHED)

**Exhibit A**

**Plans and Specifications**

The following described drawings, plans, and specifications related to the Contractors Work identified have been delivered to the Contractor. Receipt of a copy of the specifications is hereby acknowledged and the plot plans, plans, and specifications are incorporated into and made a part of this Contract.  Revisions to the plans and specifications made subsequent to the execution of the contract, if any, shall be co-signed by the parties and become part of this Contract.

Drawings: Sheet No.

Cover Sheet: CS-1, CS-2 (9/15/20)

Civil: C-0, C-0.1, C-1, C-1.1, C-1.2, C-1.3, C-2, C-3, C-3.1, C-4, C-4.1, C-6, C-7, C-7.1, C-7.2, C-7.3, C-7.4, C-8, L-1, L-1.1, I-1, I-1.1 (9/9/20)

Architectural: A-1, A-2, A-3a, A-3b, A-3.1, A-3.2, A-4, A-4.1, A-5, A-6, A-6.1, A-7, A-7.1, A-8, A-9, A-10, A-11, PP-1 (9/15/20)

Structural: S-0, S-1, S-2, S-3, S-3.1, S-4, S-4.1, S-5, S-5.1, S-5.2, S-5.3 (9/15/20)

Mechanical: M-1, M-2, M-3 (9/15/20)

Plumbing: P-1, P-2, P-3, P-4, PP-4 (9/15/20)

Electrical: E-1, E-2, E-3.1, E-3.2, E-4, E-5, ES-1 (9/15/20)

Valvoline Instant Oil Change Project Manual (8/18/20)

Geotech Report prepared by Giles Engineering (1/7/20)

EXHIBIT B

PROJECT SCHEDULE

(SEE ATTACHED)

-20-



EXHIBIT C

CONTRACT SUM

(SEE ATTACHED)



**Unit Prices:**

| | |
|---|---|
| Loading/ Haul Off (Cubic Yard) | $ 16 |
| Engineered Fill per spec with On-Site Material (Cubic Yard ) | $ 5 |
| Engineered Fill per spec with Imported Material (Cubic Yard) | $ 22 |
| Over excavation (Cubic Yard) | $ 5 |
| Shoring (Linear Feet of Sheet Piling) | $140/LF |

Alternate #1   Add alternate for Well Point Dewatring System

$   13,000.00

**PROJECT INFORMATION**

**Valvoline (Mesa, AZ)**

Mesa, AZ 85204

| | |
|---|---|
| **Owner:** | Valvoline (Mesa, AZ) |
| **Architect:** | Greenberg Farrow |
| **Date:** | 10/28/2020 |

CLOUD
CONSTRUCTION + CONSULTANTS
— LIVING BALANCED —

## *Per Plans and Specifications Provided*

| # | Project Exhibits |
|---|---|
| 1 | Proposal is good for 90 days from the date above |
| 2 | Proposal is based on Architectural drawings dated 9/15/2020 by Greenberg Farrow |
| 3 | Proposal is based on Civil Drawings dated 09/09/2020 by Greenberg Farrow |
| 4 | Proposal acknowledges Geotech Engineering Report dated 01/07/2020 by Giles Engineering Associates |
| 5 | Proposal acknowledges Project Manual dated 08/18/2020 by Greenberg Farrow |
| 6 | Project acknowledges Exhibits A-D supplied with bidding documents |
| 7 | Cloud CM requires a 2 week mobilization period from executed contract and/or receipt of building permit |
| 8 | Proposal includes cost for all required insurance policies and coverages, including Builder's Risk and payment and performance bond. |
| 9 | Proposal based on a **15 week (105 days)** construction schedule |

| # | Exclusions |
|---|---|
| 1 | Proposal excludes costs arising from delayed delivery of materials and/or equipment due to supply chain complications from the COVID-19 impact; GC reserves the right to add days to the schedule due to these delays without penalty. Any delays caused will be subject to GC's extended general conditions. GC will submit material substitutions for approval by Owner for any/all items affected, as needed to eliminate delay to the project schedule. |
| 2 | Proposal does not include added days for late delivery of Owner-provided items. GC reserves right to add days for schedule overruns due to owner furnished items not arriving on site in a timely manner. |



October 21, 2020

To whom it may concern:

On behalf of Cloud CM LLC, please accept this letter as evidence of our ability to provide performance and payment bonds. We currently have in place for this client bonding capacity up to $2,000,000 per project with a $6,000,000 bonded aggregate. Bonds are underwritten by HIIG/Great Midwest Insurance Company, rated A-IX by "A.M. Best Co." and listed on the updated Department of the Treasury's Listing of Approved Sureties.

Having done business with Cloud CM for several years, we consider the firm to be a professionally managed, well-financed construction company with expertise to complete projects on time and as specified. In the years we have insured and/or bonded Cloud CM we have never had a problem with the performance of work or the payment of obligations. It is without reservation that we offer our unqualified recommendation of this company.

This commitment, of course, is subject to a satisfactory review of contract documents, bond forms, financing and other pertinent underwriting factors at the time of each bond request. Please contact this office for further information.

Sincerely,

W. Wesley Hamilton, Jr.

EXHIBIT D

BID CLARIFICATION

(SEE ATTACHED)



Valvoline Instant Oil Change
100 Valvoline Way
Lexington, KY 40509

VIOC Bid Clarification:

1. As a matter of clarification purposes during the bid process, Valvoline, Inc requires all GC's to include "Construction" dewatering during construction. This line item cost should cover your expense from the time the pit is excavated and up to the time you have completed the installation of the drain tile and storm structure system shown on the civil sheets of the plans. At a minimum, Valvoline requires this installation to consist of two pumps around the excavated pit at two separate locations capable of being powered 24 hours a day 7 days a week when required.

# EXHIBIT 2



Cloud Construction
3101 Cobb Pkwy SE
Suite 124
Atlanta, GA 30339
678.699.3639
thecloudcm.com

# *Change Order*

| VALVOLINE | Change Order # 01 |
|---|---|
| 100 Valvoline Way | Date:05/19/21 |
| Lexington, Kentucky 40509 | To: Dan Boyle |
| | Project: Valvoline – Mesa AZ |
| Name: Dan Boyle | |
| Phone Number: 720.255.9294 | |

**Brick modification in regards of revised detail on page A4.1.**

| Plan Set Revisions: | Page #(s): |
|---|---|
| Anticipated day delays: **+3** | |
| Date & Name Cloud CM Rep Notified: | |
| Email communication included: Y/N | |

| Description | Description2 | Amount |
|---|---|---|
| See attached document received from masonry contractor. | | |
| | | |
| | | |
| | | |
| LABOR & MATERIAL: | | |
| | | $ 11,650.00 |
| GC FEES: | | |
| | | $ 1,165.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | *(signature)* 5/d5/21 | |
| **Total** | | **$12,815.00** |

EXHIBIT 3

| Cloud CM, LLC<br>3101 Cobb Pkwy SE, Suite 124<br>Atlanta, GA 30339<br>678.699.3639 |  |
| --- | --- |

**TRANSMITTAL FORM**

**Project Name:** Valvoline            **Payment Application Number:** 2

**Document/Description**

| PAGE | | Conditional | Uncond |
| --- | --- | --- | --- |
| 1 & 2 | AIA pay application (2 pages) | | |
| 3 | Cloud CM Conditional Release (this application) | | |
| 4 | Cloud CM Unconditional Release (application #1) | | |
| | Subcontractor Releases | Conditional | Uncond |
| 5 & 6 | Allred Metal | draw 2 | draw 1 |
| 7 & 8 | Benson Systems | draw 1, 2 | |
| 9 | Connect 2 Build | draw 1, 2 | |
| 10 | JM Landscaping Pros | | draw 1 |
| 11 to 14 | PMD | draw 1, 2, 3 | draw 1,2 -wire confrimation, pending receipt from atty |
| 15 & 16 | USA Fire | draw 1,2 | |
| | | | |
| | | | |
| | | | |
| | | | |

**Application and Certificate For Payment**

Page 1

| To Owner: | Valvoline Instant Oil Change<br>100 Valvoline Way<br>Lexington, KY 40509 | Project: | Valvoline - Mesa, AZ<br>1864 East Baseline Road<br>Mesa, AZ 85204 | Application No: | 2 | Date: 06/01/2021 |
|---|---|---|---|---|---|---|
| | | | | Period To: | 06/30/21 | |
| From<br>(Contractor): | Cloud CM, LLC<br>3101 Cobb Pkwy Suite 124<br>Atlanta, GA 30339 | Contractor Job<br>Number: | 17120 | Architect's<br>Project No: | | |
| | | Via (Architect): | | Contract Date: | | |
| Phone: | 678 699-3639 | Contract For: | | | | |

**Contractor's Application For Payment**

| | | | | |
|---|---|---|---|---|
| Original contract sum | | | | 1,422,050.00 |
| Net change by change orders | | | | 12,815.00 |
| Contract sum to date | | | | 1,434,865.00 |
| Total completed and stored to date | | | | 725,500.75 |
| Retainage | | | | |
| 10.0% of completed work | | | | 68,190.08 |
| 10.0% of stored material | | | | 4,360.00 |
| Total retainage | | | | 72,550.08 |
| Total earned less retainage | | | | 652,950.67 |
| Less previous certificates of payment | | | | 306,942.07 |
| Current payment due | | | | 346,008.60 |
| Balance to finish, including retainage | | | | 781,914.33 |

**Change Order Summary**

| | Number | Additions | Deductions |
|---|---|---|---|
| Change orders approved in previous months by owner | | 12,815.00 | |
| Change orders approved this month | Date Approved | | |
| Totals | | 12,815.00 | |
| Net change by change orders | | 12,815.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

Final revision:

Contractor: [signature]    Luis Torres    Date: 07/14/21

By: [signature]

State of: _Georgia_    County of: _Jackson_

Subscribed and sworn to before me this 14th day of July

2021 (year). Notary public: [signature]

My commission expires _7-24-21_

ANGELA PROSSER
NOTARY PUBLIC
JACKSON COUNTY
STATE OF GEORGIA
My Commission Expires July 24, 2021

| 0.000% of taxable amount | | | | 0.00 |
| Current sales tax | | | | 0.00 |

**Architect's Certificate for Payment**

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the Amount Certified.

Amount Certified:   $ _____

Architect: _____

By: _____  Date: _____

This Certification is not negotiable. The Amount Certified is payable only to the Contractor named herein. Issuance, payment, and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

**Application and Certificate For Payment -- page 2**

To Owner:            Valvoline Instant Oil Change
From (Contractor):   Cloud CM, LLC
Project:             Valvoline – Mesa, AZ

Application No:  2
Contractor's Job Number:
Architect's Project No:

Date: 06/01/21
17120
Period To: 06/30/21

| Item Number | Description | Scheduled Value | Work Completed | | Materials Presently Stored | Completed and Stored to Date | % | Balance to Finish | Retention | Memo |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Previous Application | This Period | | | | | | |
| 0 | General Conditions | 84,740.00 | 23,339.10 | 14,793.90 | 0.00 | 38,133.00 | 45.00 | 46,607.00 | 3,813.30 | |
| 01 | Earthwork | 80,541.00 | 44,335.00 | 20,700.00 | 0.00 | 65,035.00 | 80.75 | 15,506.00 | 6,503.50 | |
| 02 | Site Concrete | 70,230.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 70,230.00 | 0.00 | |
| 03 | Paving | 63,520.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 63,520.00 | 0.00 | |
| 04 | Site Utilities | 124,100.00 | 1,200.00 | 79,465.00 | 0.00 | 80,665.00 | 65.00 | 43,435.00 | 8,066.50 | |
| 05 | Site Misc. | 53,278.00 | 18,500.00 | 2,500.00 | 0.00 | 21,000.00 | 39.42 | 32,278.00 | 2,100.00 | |
| 06 | Building Concrete | 132,500.00 | 115,713.00 | 12,787.00 | 0.00 | 128,500.00 | 96.98 | 4,000.00 | 12,850.00 | |
| 07 | Masonry | 83,875.00 | 0.00 | 0.00 | 43,600.00 | 43,600.00 | 51.98 | 40,275.00 | 4,360.00 | |
| 08 | Metals | 145,758.00 | 93,305.00 | 49,195.00 | 0.00 | 142,500.00 | 97.76 | 3,258.00 | 14,250.00 | |
| 09 | Wood & Plastics | 108,247.00 | 0.00 | 81,185.25 | 0.00 | 81,185.25 | 75.00 | 27,061.75 | 8,118.53 | |
| 10 | Thermal & Moisture Protection | 67,755.00 | 28,500.00 | 2,500.00 | 0.00 | 31,000.00 | 45.75 | 36,755.00 | 3,100.00 | |
| 11 | Doors & Windows | 65,734.00 | 0.00 | 32,867.00 | 0.00 | 32,867.00 | 50.00 | 32,867.00 | 3,286.70 | |
| 12 | Finishes | 45,619.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 45,619.00 | 0.00 | |
| 13 | Specialties | 7,507.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,507.00 | 0.00 | |
| 14 | Mechanical | 110,721.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 | 2.26 | 108,221.00 | 250.00 | |
| 15 | Electrical | 68,295.00 | 2,200.00 | 1,500.00 | 0.00 | 3,700.00 | 5.42 | 64,595.00 | 370.00 | |
| 16 | Contractor Fee | 93,031.00 | 13,994.85 | 32,560.85 | 0.00 | 46,515.50 | 50.00 | 46,515.50 | 4,651.55 | |
| 17 | General Conditions | 16,599.00 | 0.00 | 8,300.00 | 0.00 | 8,300.00 | 50.00 | 8,299.00 | 830.00 | |
| OCO #1 | Change Order #1 - Brick Mod Billing Total | 12,815.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,815.00 | 0.00 | |
| | **Application Total** | 1,434,865.00 | 341,046.75 | 340,854.00 | 43,600.00 | 725,500.75 | 50.56 | 709,364.25 | 72,550.08 | |

**CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT NAME:**   Valvoline
        1864 East Baseline Road
        Mesa, AZ 85204

Upon receipt by undersigned of a check from <u>Valvoline Instant Oil Change</u> in the sum of $ <u>346,008.60</u> payable to <u>Cloud CM, LLC</u> and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent.   This release covers a progress payment for labor, services, equipment, or material furnished through <u>6/30/21</u> only, and does not cover any retention retained before or after the release date, extras furnished before the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release.  This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment.   Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

LIEN CLAIMANT (Company Name):  <u>Cloud CM, LLC</u>

BY:_____

TITLE: <u>Project Manager</u>

DATE: <u> 7/14/21                 </u>

FEDERAL ID #: <u>81-4139186</u>

TELEPHONE #: <u>(678) 699-3639</u>

**UNCONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT INFORMATION:**          Valvoline
                                                     1864 East Baseline Road
                                                     Mesa, AZ 85204

The undersigned has been paid and received a progress payment in the sum of
$306,942.07 for labor and services, equipment, or materials furnished to the Contractor,
Owner or Prime Subcontractor on the above described Project.  The undersigned does
certify that any and all payments due to third parties on said project for services and/or
materials have been paid through 3/31/21.  The undersigned does hereby release pro
tanto any mechanic liens, stop notice or bond rights that the undersigned has on said
Project through 3/31/21, only and does not cover any retention or items furnished after
said date.

**NOTICE:**  This document waives rights unconditionally and states that you have been
paid for giving up those rights.  This document is enforceable against   you if you sign it,
even if you have not been paid.  If you have not been paid, use a conditional release
form.

LIEN CLAIMANT:  Cloud CM, LLC

I certify under penalty of perjury under laws of the State of ___GEORGIA___ that
the above is a true and correct statement.

SIGNATURE: _____

PRINTED NAME: __Luis Torres__

TITLE:_____Project Manager_____

Dated this ___14th___ day of ___July___, 20 21

At _____

Subscribed and Sworn before me day this ___14th___ day of

_____, 20 21 .

_____

Notary Public, State of ___GEORGIA___

ANGELA PROSSER
NOTARY PUBLIC
JACKSON COUNTY
STATE OF GEORGIA
My Commission Expires July 24, 20 21

**CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT INFORMATION:**

Project Name: Valvoline - Mesa

Project Address: 1964 E. Baseline Road

Mesa, AZ 85204

Upon receipt by the undersigned of a check from Cloud CM, LLC in the sum listed below payable to the subcontractor listed below and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment to the undersigned for labor, services, equipment, or material furnished through the date listed below only, and does not cover any retention retained before or after the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment.

Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

SUM OF PAYMENT: $49,080.50

MONTH ENDING DATE OF COORESPONDING PAY APP: 04/30/2021

LIEN CLAIMANT (your company's name): Allred Metal Products, Inc.

SIGNATURE: Veronica Marquez  Digitally signed by Veronica Marquez Date: 2021.04.22 12:24:00 -07'00'

PRINT NAME: Veronica M Marquez

TITLE: Project Administrator

DATE: 04/22/2021

FEDERAL ID: 86-0648390

PHONE: 602-437-3048

**UNCONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT INFORMATION:**

Project Name:     Valvoline - Mesa

Project Address:     1964 E. Baseline Road

Mesa, AZ 85204

The undersigned has been paid and received a progress payment in the sum stated below for labor and services, equipment, or materials furnished to the Contractor, Owner or Prime Subcontractor on the above-described Project. The undersigned does certify that any and all payments due to third parties on said project for services and/or materials have been paid through month ending date as stated below. The undersigned does hereby release pro-tanto any mechanic liens, stop notice or bond rights that the undersigned has on said Project through month ending date as stated below, only and does not cover any retention or items furnished after said date.

**NOTICE:** This document waives rights unconditionally and states that you have been paid for giving up those rights. This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form.

Pay App Amount:     $83,974.50

Month Ending Date: ___03/31/2021___

LIEN CLAIMANT (your company's name):   Allred Metal Products, Inc.

I certify under penalty of perjury under laws of the State of     **Arizona**     that the above is a true and correct statement.

SIGNATURE: _Ken W. Allred_

PRINT NAME:     Kevin W. Allred

TITLE:     President

Dated this __17TH__ day of __JUNE__ , 20_21_

State of _ARIZONA_     County of _MARICOPA_

Subscribed and Sworn before me day this _17_ day of _JUNE_ , 20_21_ .

Notary Signature _Veronica M Marquez_

Print Name   _VERONICA M MARQUEZ_

My commission expires: _August 27, 2024_

VERONICA M MARQUEZ
Notary Public, State of Arizona
Maricopa County
Commission # 591822
My Commission Expires
August 27, 2024

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT
(Pursuant to A.R.S. §33-1008)

Project:    Valvolinee - Mesa
Project #:  17120-009

On receipt of the undersigned a check from                    Cloud CM, LLC
                                                              (Maker of Check)
in the sum of                    $20,730.60                           payable to

                              Benson Systems
                          (Payee or Payees of Check)
and when the check has been properly endorsed and has been paid by the bank on which it is drawn,

this document becomes effective to release any mechanic's lien, any state federal statutory bond right,

any private bond right, any claim for payment and any rights under similar ordinance rule or statute

related to claim or payment rights for persons in the undersigned's position, the undersigned has

on the job of                              Valvolinee - Mesa
                                              (Owner)
located at                          1864 East Baseline Road
                                        (Job Description)
to the following extent. This release covers a progress payment for all labor, services, equipment

or materials furnished to the jobsite or to                    Cloud CM, LLC
                                            (Person with whom undersigned contracted)
through              5/31/2021            only and does not cover any retention, pending
                        (Date)
modifications and changes or items furnished after that date. Before any recipient of this document

relies on it, that person should verify evidence of payment to the undersigned

The undersigned warrants that he either has already paid or will use the monies he receives from this
progress payment to promtly pay in full all his laborers, subcontractors, materialmen and suppliers
for all work, materials, equipment or services provided for or to the above-referenced project up
to the date of this waiver.

Date:              5/17/2021                        Benson Systems
                                                    (Company Name)

MICHELLE M. RAMIREZ
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
February 9, 2022

2-9-2022

By: _____
     (Signature)
     Accounting & Contracts
     (Title)

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT
(Pursuant to A.R.S. §33-1008)

Project:     Valvolinee - Mesa
Project #:    17120-009

On receipt of the undersigned a check from        Cloud CM, LLC
                                                                  (Maker of Check)
in the sum of                        $20,730.60                    payable to

                                   Benson Systems
                               (Payee or Payees of Check)
and when the check has been properly endorsed and has been paid by the bank on which it is drawn,

this document becomes effective to release any mechanic's lien, any state federal statutory bond right,

any private bond right, any claim for payment and any rights under similar ordinance rule or statute

related to claim or payment rights for persons in the undersigned's position, the undersigned has

on the job of                          Valvolinee - Mesa
                                      (Owner)
located at                      1864 East Baseline Road
                                    (Job Description)
to the following extent. This release covers a progress payment for all labor, services, equipment

or materials furnished to the jobsite or to           Cloud CM, LLC
                                     (Person with whom undersigned contracted)
through              6/30/2021       only and does not cover any retention, pending
                    (Date)
modifications and changes or items furnished after that date. Before any recipient of this document

relies on it, that person should verify evidence of payment to the undersigned

The undersigned warrants that he either has already paid or will use the monies he receives from this
progress payment to promtly pay in full all his laborers, subcontractors, materialmen and suppliers
for all work, materials, equipment or services provided for or to the above-referenced project up
to the date of this waiver.

Date:             6/17/2021                     Benson Systems
                                            (Company Name)

                                          By:
                                              (Signature)
                                              Accounting & Contracts
                                              (Title)

MICHELLE M. RAMIREZ
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
February 9, 2022

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT

Project         Valvoline - Mesa

Job No.         17120

On receipt by the signer of this document of a check from     Cloud CM, LLC     (maker of check) in the sum of $     $45,000.00     payable to     Connect 2 Build LLC     (payee or payees of check) and when the check has been properly endorsed and has been paid by the bank on which it is drawn, this document becomes effective to release any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule or statute related to claim or payment rights for persons in the signer's position that the signer has on the property of     Valvoline     (owner) Located at  1864 E Baseline Rd, Mesa, AZ 85204 (location) to the following extent.

This release covers a progress payment for all labor, services, epuipment, or materials furnished to the property or to     Cloud CM, LLC     (person with whom signer contracted) as indicated in the attached statement(s) or progress payment request(s), except for unpaid retention, pending modifications and changes, or other items furnished.

Before any recipient of this document relies on this document, the recipient should verify evidence of payment to the undersi

The signer warrants that the signer has already paid or will use the funds received from this progress payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen, and suppliers for all work, materials, equipment, or services provided for or to the above referenced project in regard to the attached statement(s) up to the date of this waiver.

Date         44364

        Connect 2 Build LLC         (Company Name)

By _____         (Signature)

        Owner         (Title)

STATE OF         Arizona

COUNTY OF         Maricopa

This instrument was acknowledged before me on this 17th day of   June   , 2021, by
Jeffrey Dwigun         (name),         Owner         (job title)   of
Connect 2 Build, LLC         (company name).

HILDA STRALEY
Notary Public, State of Arizona
Maricopa County
My Commission Expires
October 11, 2021

NOTARY PUBLIC

**UNCONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT INFORMATION:**

Project Name: *Valvoline - Mesa*

Project Address: *1864 E Baseline Rd*

*Mesa AZ 85204*

The undersigned has been paid and received a progress payment in the sum stated below for labor and services, equipment, or materials furnished to the Contractor, Owner or Prime Subcontractor on the above-described Project. The undersigned does certify that any and all payments due to third parties on said project for services and/or materials have been paid through month ending date as stated below. The undersigned does hereby release pro-tanto any mechanic liens, stop notice or bond rights that the undersigned has on said Project through month ending date as stated below, only and does not cover any retention or items furnished after said date.

**NOTICE:** This document waives rights unconditionally and states that you have been paid for giving up those rights. This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form.

Pay App Amount: *$21,142.85*

Month Ending Date: *Today Date / 19/June/2021*

LIEN CLAIMANT (your company's name): *JM LANDSCAPING PROS. INC*

I certify under penalty of perjury under laws of the State of _____ that the above is a true and correct statement.

SIGNATURE: *Jordy Morales Mimila*

PRINT NAME: *Jordy Morales Mimila*

TITLE: *Owner - Partner*

Dated this *19* day of *June*, 20 *21*

State of *Arizona* County of *Maricopa*

Subscribed and Sworn before me day this *19* day of *June*, 20 *21*

Notary Signature *Luz Maria Garcia Elicerio*

Print Name *Luz Maria Garcia Elicerio*

My commission expires: *July-31-2022*

**CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

**PROJECT INFORMATION:**

Project Name:     Mesa Valvoline

Project Address:     1864 E Baseline RD

Mesa, AZ

Upon receipt by the undersigned of a check from Cloud CM, LLC in the sum listed below payable to the subcontractor listed below and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release any mechanic's liens, stop notice or bond rights that the undersigned has on said Project for the following extent. This release covers a progress payment to the undersigned for labor, services, equipment, or material furnished through the date listed below only, and does not cover any retention retained before or after the release date for which payment has not been received; extras or items furnished after said date.

Rights based upon work performed or items furnished under a written change order which has been fully executed by the parties prior to the release date are covered by this release unless specifically reserved by the claimant in this release. This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a rescission, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment.

Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

SUM OF PAYMENT:     74,736.00

MONTH ENDING DATE OF COORESPONDING PAY APP:     2/20/2021

LIEN CLAIMANT (your company's name):     PMD Development LLC

SIGNATURE: _____

PRINT NAME:     Troy Pearce

TITLE:     Owner

DATE:     2.21.2021

FEDERAL ID:     81-1486774

PHONE:     480-980-3568

5/18/2021                               IBERIABANK TreasuryConnect

## Payment Activity : Current Activity



|  | ACH Payments | Wire Transfers | Account Transfers | ALL TRANSACTIONS |
|---|---|---|---|---|
| **PENDING** | $0.00 (0) | $60,000.00 (1) | $0.00 (0) | $60,000.00 (1) |
| **COMPLETE** | $0.00 (0) | $127,423.20 (1) | $0.00 (0) | $127,423.20 (1) |
| **ALL** | $0.00 (0) | $187,423.20 (2) | $0.00 (0) | $187,423.20 (2) |

Show Status Detail                                                                    Refresh

Search Transactions

Prev 1 Next   Go to page 1      Showing 1 - 2 of 2                    Items to display: 10 20 50

+ / −   Approve   Release   Approve And Release

**DWR-04781507**          **$60,000.00    Delivered**                          View

    **Payment Date:** 05/18/2021
    **Originator:** CLOUD CM LLC  *5780 - DDA (Cloud CM Operating) - IBERIABANK (265270413)
    **Beneficiary:** Earthcore Development, Inc - Account Number *4378

**DWR-04779670**          **$127,423.20    Completed**                         View

    **Payment Date:** 05/18/2021
    **Originator:** CLOUD CM LLC  *5780 - DDA (Cloud CM Operating) - IBERIABANK (265270413)
    **Beneficiary:** PMD Development LLC - Account Number *2682

+ / −   Approve   Release   Approve And Release

Prev 1 Next   Go to page 1      Showing 1 - 2 of 2                    Items to display: 10 20 50

Results returned in 0.045 seconds

* indicates required fields
Page generated on 05/18/2021 at 2:35 PM CDT

Privacy & Legal    Security

**IBERIABANK** - Member FDIC, Equal Housing Lender
Copyright © 2012 - All rights reserved.

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT
*(Pursuant to A.R.S. § 33-1008)*

Project Name: **Valvoline Mesa**
     Project #: 17120
   Sub Invoice #: 9919

Upon receipt by the undersigned of a check from     Cloud Construction
                                                                 *(Maker of Check)*

in the sum of      **$**       **1,836.00**   payable to     USA Fire Protection
                 *(amount of Check)*                                                 *(Payee or Payee Check)*

and when the check has been properly endorsed and has been paid by the bank on which it is drawn, this document becomes effective to release any Mechanic's Lien, any state or federal statutory bond right, any private bond right, any claim for payment and any rights under any similar ordinance, rule or statute related to claim or payment rights for persons in the undersigned's position that the undersigned has on the job of

                                                       Valvoline Mesa
                                                       *(Project Name)*

Located at:     1864 E Baseline Road                         Mesa, AZ  85024
                                         *(Job Description)*

to the following extent.   This release covers a progress payment for all labor, services, equipment or materials furnished to the jobsite or to

                        Cloud Construction                  through      04/30/21
                 *(Person with whom undersigned contracted)*                                     *(Date)*

only and does not cover any retention, pending, modifications and changes or items furnished after that date.  Before any recipient of this document relies on it, that person should verify evidence of payment to the undersigned. The undersigned warrants that he either has already paid or will use the monies he receives from this progress payment to promptly pay in full all of his laborers, subcontractors, material men and suppliers for all work, materials, equipment or services provided for or to the above-referenced project up to the date of this waiver.

           DATE:     4/20/2021

                                                **USA Fire Protection**
                                                   *(Company Name)*

                        By:
                                                    *(Signature)*

                                                     *(Title)*

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT
*(Pursuant to A.R.S. § 33-1008)*

Project Name: **Valvoline Mesa**
      Project #: 17120
  Sub Invoice #: 9972

Upon receipt by the undersigned of a check from      Cloud Construction
                                                                 *(Maker of Check)*

in the sum of    $     **7,588.80**   payable to    USA Fire Protection
                     *(amount of Check)*                                                *(Payee or Payee Check)*

and when the check has been properly endorsed and has been paid by the bank on which it is drawn, this document becomes effective to release any Mechanic's Lien, any state or federal statutory bond right, any private bond right, any claim for payment and any rights under any similar ordinance, rule or statute related to claim or payment rights for persons in the undersigned's position that the undersigned has on the job of

                                         Valvoline Mesa
                                         *(Project Name)*

Located at:     1864 E Baseline Road                         Mesa, AZ  85024
                                     *(Job Description)*

to the following extent. This release covers a progress payment for all labor, services, equipment or materials furnished to the jobsite or to

                      Cloud Construction                 through       06/30/21
                  *(Person with whom undersigned contracted)*                          *(Date)*

only and does not cover any retention, pending, modifications and changes or items furnished after that date. Before any recipient of this document relies on it, that person should verify evidence of payment to the undersigned. The undersigned warrants that he either has already paid or will use the monies he receives from this progress payment to promptly pay in full all of his laborers, subcontractors, material men and suppliers for all work, materials, equipment or services provided for or to the above-referenced project up to the date of this waiver.

        DATE:    6/18/2021                                  **USA Fire Protection**
                                                         *(Company Name)*

                                             By:
                                                          *(Signature)*

                                                          *(Title)*

EXHIBIT 4



**Jason D. Sanders**

jason.sanders@dentons.com
D    +1 602-508-3971

Dentons US LLP
2398 East Camelback Road
Suite 850
Phoenix, AZ  85016-9007
United States

dentons.com

December 3, 2021

**BY CERTIFIED MAIL, FEDEX OVERNIGHT AND ELECTRONIC MAIL**

Lee Carroll
Cloud CM, LLC (Construction Management)
3101 Cobb Parkway #124
Atlanta, GA 30339
lcarroll@builtbycloud.com

W. Wesley Hamilton
Great Midwest Insurance Company
800 Gessner, Suite 600
Houston, TX 77024
whamilton@sspins.com

Re:     **Construction Agreement Between Valvoline LLC ("Owner") and Cloud CM, LLC
         ("Contractor") dated October 26, 2020 (the "Agreement")**

         **Notice of Default**

Dear Sirs:

        I am writing on behalf of Owner regarding the above referenced Agreement in connection with the
Valvoline Instant Oil Change Facility Project located at 1864 East Baseline Road, Mesa, Arizona 85204
(the "Project").

        Contractor is in default of the Agreement pursuant to Section 16 because (1) it has failed,
neglected, and refused to perform the Work; and (2) the Work has been unreasonably delayed.
Specifically, the Project Schedule included as Exhibit B to the Agreement showed completion of the
Project in 113 calendar days.  Although construction did not commence until February 1, 2021, as of the
date of this letter the Project is only approximately 50% complete and more than 300 days have elapsed.
Owner has received dozens of schedule updates from Contractor throughout the Project, but Owner has
never agreed to modify the contractually agreed upon schedule duration.  With the approach of 200 days
of delay on a Project originally scheduled to be completed in 113 calendar days, there can be no doubt
that the Project has been unreasonably delayed.  Even Contractor's own proposed change order for a
time extension, which Owner rejects, only requests enough days to account for approximately the number
of days of delay if the Project were complete as of the date of this letter.  The request does not account
for the additional time necessary to complete the Project, which Owner estimates to be at least
approximately half of the time originally scheduled for the Project.  Therefore, Contractor tacitly
acknowledges responsibility for over 50 days of delay, which is substantial and unreasonable.  With a

Fernanda Lopes & Associados ▶ Guevara & Gutierrez ▶ Paz Horowitz Abogados ▶ Sirote ▶ Adepetun Caxton-Martins Agbor & Segun ▶
Davis Brown ▶ East African Law Chambers ▶ Eric Silwamba, Jalasi and Linyama ▶ Durham Jones & Pinegar ▶ LEAD Advogados ▶ Rattagan
Macchiavello Arocena ▶ Jiménez de Aréchaga, Viana & Brause ▶ Lee International ▶ Kensington Swan ▶ Bingham Greenebaum ▶ Cohen &
Grigsby ▶ Sayarh & Menjra ▶ For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

US_ACTIVE\119940303\V-1



dentons.com

proper schedule analysis, Owner is confident that Contractor would be shown to be responsible for well over 100 days of delay and possibly over 200 days of delay.

Contractor has also repeatedly failed to perform the Work in accordance with the Plans and Specifications, much of which has contributed to the unreasonable delay to the Project. As Parker Cook, the project manager for Contractor, admitted in his email dated August 25, 2021, the slab for the Project was poured to dimensions of 66'-0" by 30'-2" even though the foundation plan shows the slab as 67'-0" by 31'-0". *See* August 25, 2021 email attached as Exhibit A. This resulted in significant re-work by the concrete contractor, among other issues. Further, the piping for the Project's fire suppression system was installed improperly, with portions of pipe crossing through and obstructing the oil change bays. Moreover, the Notice of Default letter from Contractor (discussed in more detail below) refers to an alleged "Stop Work Order" dated August 26, 2021, which Owner never issued. It was necessary to pause the building construction due to Contractor's failure to correctly pour the slab as noted above, but significant site work remained to be done, and still remains to be done, but Contractor has failed and refused to perform this work. Contractor has also been in possession of revised drawings from the architect since September 17, 2021 indicating how to proceed with the building construction in light of Contractor's failure to properly pour the concrete slab, yet Contractor has continued to refuse to move forward with this work. *See* September 17, 2021 email attached as Exhibit B.

Contractor also submitted invoices, which Owner paid, claiming payment for materials that were not actually purchased by Contractor or any of its subcontractors. Application for Payment No. 2 executed July 14, 2021 includes $43,600.00 for line item no. 7 Masonry under the column heading "Materials Presently Stored" as well as $32,867.00 for line item no. 11 Doors and Windows under the column heading "Completed and Stored to Date." However, when Owner inquired regarding the location of the masonry, doors and windows, Contractor confirmed that these materials were not actually purchased and were not in storage, either on- or off-site. At best, this is a material breach of the Agreement. At worst, this may be fraud.

Pursuant to Section 16 of the Agreement, Contractor has forty-eight (48) hours from receipt of this written notice to remedy or commence action to immediately remedy the defaults described above.

If Contractor fails to take and diligently pursue effective corrective actions within the above time period, Owner, pursuant to Section 16 of the Agreement, reserves the right to (without prejudice to any other remedy Owner may have), terminate the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the Work by whatever method Owner may deem expedient.

In addition, Owner will pursue recovery of all damages suffered, including, but not limtied to, lost profits related to the significant delay in completing the Project, additional rent paid pursuant to Owner's lease during the delay period, and the additional costs incurred by retaining a replacement contractor to complete the Project.

**Application for Payment No. 5**

Owner is in receipt of Application for Payment No. 5 executed on November 3, 2021. Owner will make payment in the amount of $18,455.93 as requsted in Application for Payment No. 5 under protest

US_ACTIVE\119940303\V-1



December 3, 2021
Page 3

dentons.com

and with a full reservation of rights, claims, remedies, damages, and positions against Contractor and its subcontractors, including, without limitation, the right to seek disgorgement of all funds paid (or to be paid) to compensate Owner for its damages resulting from Contractor's multiple material breaches of the Agreement.

**Response to Contractor's December 1, 2021 Notice of Default (the "Notice of Default")**

In the Notice of Default, Contractor demands that Owner execute certain proposed change orders allegedly pursuant to the clause in Exhibit C of the Agreement, which states "Proposal excludes costs arising from delayed delivery of materials and/or equipment <u>due to supply chain complications from the COVID-19 impact</u>," (emphasis added).  Yet none of the supporting documentation for the proposed change orders indicates that the price increases are related in any way to COVID-19.  Rather, there is every indication that the price escalation that Contractor seeks to recover is simply a price escalation that has occurred due to the passage of time from when Contractor initially received bids for the Project until the time that Contractor actually sought to belatedly engage certain subcontractors.  The Agreement is for a lump sum of $1,422,050.00.  The Agreement is not based on the cost of the Work with no limit and nothing requires the Owner to execute proposed change orders for costs that Contractor is not entitled to receive.

At least one of the proposed change orders also presents an expired bid for approval.  The proposed change order for alleged escalation for the electrical scope of work presents Ausi Builders as a proposed replacement contractor.  However, the proposed change order is dated November 18, 2021, fifteen days after the attached proposal from Ausi Builders dated November 3, 2021, which includes a statement that the proposal "is valid for 14 days only."  *See* Exhibit C.  Accordingly, even if Owner approved this proposed change order, it appears from the face of Ausi Builders' proposal that they are not prepared to honor that proposal and execute a subcontract.

Contractor's citation to Arizona Statute Section 32-1129.04(D) is also confusing and fails to support Contractor's alleged entitlement to terminate the Agreement.  First, Arizona Statute Section 32-1129.04(D) was renumbered as Section 32-1185 approximately two years ago. Second, Section 32-1185(D) allows a <u>subcontractor</u> to suspend performance or terminate if the owner fails to "approve and certify portions of the contractor's billing or estimate."  This section is inapplicable, because Contractor is not a subcontractor, and the proposed change orders at issue are not a "billing or estimate" but rather requests for an increase in price to which Contractor is not entitled under the Agreement.  Therefore, neither Arizona Statute Section 32-1185(D), nor any other statute or provision of the Agreement provides the Contractor the authority to terminate the Agreement based upon Owner's proper rejection of the proposed change orders.  To the extent Contractor continues to seek to terminate the Agreement based on the proposed change orders, Owner will take such actions as additional acts of default by Contractor under the Agreement.

Sincerely,

Dentons US LLP

/s Jason D. Sanders

Jason D. Sanders



dentons.com

December 3, 2021
Page 4

JDS:bh

cc: Brett Holtegel (BAHoltegel@valvoline.com)
    Jerett Vance (JVance@valvoline.com)

# EXHIBIT A

**From:** Parker Cook <pcook@builtbycloud.com>
**Sent:** Wednesday, August 25, 2021 10:22 AM
**To:** Daniel Boyle <Daniel.Boyle@valvoline.com>
**Cc:** Damin Pellizzari <dPellizzari@builtbycloud.com>
**Subject:** RFI - Shortened Slab Dimensions with Pit Field Dimensions

***This is an external email message. Confirm the sender before opening attachments or clicking links. Avoid content that looks suspicious.***

Dan,

Please see attached RFI for review regarding the shortened slab and its solution. Based on our understanding in the field, the slab was poured to set dimensions of 66'-0" by 30'-2", per Damin's measurements. Per Valvoline foundation plans, the slab is shown to be 67'-0" x 31-0", indicating a 1-0" difference Plan East to West and 10" difference Plan North to South. The document attached outlines our proposed solution that Damin, myself, and the framing contractor have coordinated and believe would be the most cost effective and least invasive to the project schedule. The proposed solution indicates:

- Shortening the rough opening of the storefront of the west elevation from 10' – 8 ½" to 9 – 8 ½"
- Shortening the rough opening of the storefront of the east elevation from 12' – 11" to 12' – 1"
- Storefront would be field measured to these openings prior to fabrication to ensure proper fit.

Again, we believe this is the most cost effective solution and least invasive of the project schedule. Damin has also field verified that bay openings have remained consistent to ensure feasibility / workability within the floorspace of the bays. In the Unisex restroom and office which shall follow ADA Compliance, Damin and I have field measured and calculated these dimensions for finish to finish:

- Bathroom
  - 69" – Plan East to West, Finish to Finish
  - 92" – Plan North to South, Finish to Finish
- Office
  - 80 ½" – Plan East to West, Finish to Finish
  - 70 ½" – Plan North to South, Finish to Finish

If you would please ask the architect / engineer if these dimensions shall follow ADA compliance. If ADA compliance is not fulfilled in these two locations, we have possible options of shifting the plumbing walls on Plan south of the Unisex restroom or removing the 2x4 furred out wall on plan East of the restroom and replacing it with a 1x4 furred out wall. See attached markup for clarification and location of the walls in question.

In addition, per our conversation this morning, please see attached document regarding pit dimensions in the field, measured this morning by Damin. The dimensions from the field are as follows:

- The distance between the stairs and pit#1 – 83"
- The distance between pit#1 and pit#2 – 120"
- The distance between pit#2 and pit #3 – 121"

- The distance between pit#3 and the storage wall – 71"
- The distance between the storage wall and the exterior wall – 63"
- The dimensions of each pit – 38" x 167 ¾", typical for all pits
- The distance between the front overhead door and the pit openings – 93", typical
- The distance between the rear overhead door and the pit openings – 99", typical

Please let us know if there is anything we can do to assist in this process, and we will continue to provide any additional information or solutions that we may encounter.

Thanks,



**Parker Cook**                    *Assistant*
*Project Manager*

**Cloud Construction**
3101 Cobb Pkwy | Ste 124
Atlanta, GA 30339
o: 678.699.3639 | m: 334.780.8500

pcook@builtbycloud.com
builtbycloud.com

This e-mail contains information which may be privileged, confidential, proprietary, trade secret and/or otherwise legally protected. It is not intended for transmission to, or receipt by, any unauthorized persons. If you are not the intended recipient, please do not distribute this e-mail. Instead, please delete this e-mail from your system without copying it, and notify us that you received it in error, so that our address record can be corrected. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. No waiver of any applicable privileges or legal protections is intended (and nothing herein shall constitute such a waiver), and all rights are reserved.

# EXHIBIT B

| | |
|---|---|
| **From:** | Daniel Boyle <Daniel.Boyle@valvoline.com> |
| **Sent:** | Friday, September 17, 2021 1:33 PM |
| **To:** | Lee Carroll; Nick Swank; Parker Cook; Jack O' Keefe |
| **Cc:** | Jerett Vance; Brett Holtegel; Robert Warshefski; Lori Gafner |
| **Subject:** | FW: Mesa, AZ - Exterior Elevations |
| **Attachments:** | Reviewed 09-10-2021 GC - Field Dimension Markup.pdf |

Cloud:

Please consider this to be the approved correction, and notice to proceed,  for the issues at the VIOC in Mesa, AZ.
**PLEASE NOTE THAT ALL CORRECTIONS WILL BE AT THE SOLE EXPENSE OF CLOUD CONSTRUCTION.**

*Dan*

Dan Boyle
Construction Project Manager
M: 720-255-9294

---

**From:** Robert Warshefski <rwarshefski@greenbergfarrow.com>
**Sent:** Tuesday, September 14, 2021 7:03 AM
**To:** Parker Cook <pcook@builtbycloud.com>; Christopher Duley <Christopher.Duley@valvoline.com>; Daniel Boyle <Daniel.Boyle@valvoline.com>; Jerett Vance <JVance@valvoline.com>; Damin Pellizzari <dPellizzari@builtbycloud.com>
**Cc:** Lori Gafner <lgafner@greenbergfarrow.com>
**Subject:** RE: Mesa, AZ - Exterior Elevations

***This is an external email message. Confirm the sender before opening attachments or clicking links. Avoid content that looks suspicious.***

Team,

Per my discussion w/ Damin yesterday evening, see attached a copy of the S-1 Parker sent with items drawn in blue per my discussion w/ Damin.  In short, there are a few minor updates needed to the concrete at the brick shelf level to accommodate the support of the wood piers and brick.

It appears, based on what Damin and I discussed, the low parapet overhang has been installed tight up against the tower.  A portion of the this parapet overhang needs to be removed against the tower to allow the pier framing and brick to be installed.  The pier framing and brick occurs on all four corners of the tower.

Let me know if anyone would like to discuss further.

Kind Regards,



**Robert J. Warshefski Jr. AIA, NCARB**
Director of Architecture
92 East Main Street, Suite 410, Somerville, NJ 08876
**m:** 908.625.9195
**www.greenbergfarrow.com** |

**Confidentiality Notice:** This email may contain confidential and/or private information. If you received this email in error please delete and notify sender.

**From:** Parker Cook <pcook@builtbycloud.com>
**Sent:** Friday, September 10, 2021 6:31 PM
**To:** Robert Warshefski <rwarshefski@greenbergfarrow.com>
**Cc:** Lori Gafner <lgafner@greenbergfarrow.com>; Christopher Duley <christopher.duley@valvoline.com>; Daniel Boyle <Daniel.Boyle@valvoline.com>; Jerett Vance <JVance@valvoline.com>; Damin Pellizzari <dPellizzari@builtbycloud.com>
**Subject:** RE: Mesa, AZ - Exterior Elevations

**EXTERNAL SENDER – Do not click links or open attachments unless you recognize the sender**

Robert,

Please see attached document of dimensions taken in the field today. Green check marks indicate verified and measured dimensions, green text boxes indicate differing measurements taken, and red triangles indicate measurements that were unable to be taken in the field by Damin. If I can serve as further assistance, please let me know.

Thank you,



**Parker Cook**          *Assistant*
*Project Manager*

**Cloud Construction**
3101 Cobb Pkwy | Ste 124
Atlanta, GA 30339
o: 678.699.3639 | m: 334.780.8500

pcook@builtbycloud.com
builtbycloud.com

---

**From:** Robert Warshefski <rwarshefski@greenbergfarrow.com>
**Sent:** Thursday, September 9, 2021 1:20 PM
**To:** Parker Cook <pcook@builtbycloud.com>; Damin Pellizzari <dPellizzari@builtbycloud.com>
**Cc:** Lori Gafner <lgafner@greenbergfarrow.com>; Christopher Duley <christopher.duley@valvoline.com>; Daniel Boyle <Daniel.Boyle@valvoline.com>; Jerett Vance <JVance@valvoline.com>
**Subject:** RE: Mesa, AZ - Exterior Elevations

Parker / Damin,

Thank you for the all earlier.  Attached are plans that have highlighted dimensions for field verification.

Kind Regards,



**Robert J. Warshefski Jr. AIA, NCARB**
Director of Architecture
92 East Main Street, Suite 410, Somerville, NJ 08876
m: 908.625.9195
**www.greenbergfarrow.com** | 

**Confidentiality Notice:** This email may contain confidential and/or private information. If you received this email in error please delete and notify sender.

-----Original Appointment-----
**From:** Daniel Boyle <Daniel.Boyle@valvoline.com>
**Sent:** Wednesday, September 8, 2021 2:29 PM
**To:** Daniel Boyle; Daniel Boyle; Jerett Vance; Robert Warshefski; Parker Cook; Damin Pellizzari

2

**Subject:** Mesa, AZ - Exterior Elevations
**When:** Thursday, September 9, 2021 11:00 AM-12:00 PM (UTC-07:00) Mountain Time (US & Canada).
**Where:** Microsoft Teams Meeting

**EXTERNAL SENDER – Do not click links or open attachments unless you recognize the sender**

Rescheduled Time Only

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

Learn More | Meeting options

---

This e-mail contains information which may be privileged, confidential, proprietary, trade secret and/or otherwise legally protected. It is not intended for transmission to, or receipt by, any unauthorized persons. If you are not the intended recipient, please do not distribute this e-mail. Instead, please delete this e-mail from your system without copying it, and notify us that you received it in error, so that our address record can be corrected. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited. No waiver of any applicable privileges or legal protections is intended (and nothing herein shall constitute such a waiver), and all rights are reserved.

3









# EXHIBIT C

**Cloud Construction
3101 Cobb Pkwy
SE
Suite 124
Atlanta, GA 30339
678.699.3639**

# *Change Order*

| Valvoline | Change Order #16 |
|---|---|
| 100 Valvoline Way | November 18th, 2021 |
| Lexington, Kentucky 40509 | |
| | |
| Name: Dan Boyle | Project:   Valvoline - Mesa AZ |
| Phone Number: 720.255.9294 | 1864 Baseline Road |
| daniel.boyle@valvoline.com | Mesa, AZ 85204 |

Electrical Price Escalation. Per C&E's, "Proposal excludes cost arising from delayed delivery of materials and/or equipment due to supply chain complications from the COVID-19 impact; GC reserves the right to add days to the schedule, due to these delays without penalty. Any delays caused will be subject to GC's extended general conditions. GC will submit material substitutions for approval by Owner for any/all items affected, as needed to eliminate delay to the project schedule."

| Description | Contractor | Amount |
|---|---|---|
| Ausi Builders Proposal including Pricing Escalation (remainder of Electrical work) | Ausi Builders (Exhibit A) | $ 92,500.00 |
| | | |
| *Star Electric - Subcontract Executed 1/20/2021, Terminated Subcontract 11/02/2021* | *Star Electric (Exhibit B)* | *$ 75,000.00* |
| *Star Electric - Billed to Date 11/16/2021* | *Star Electric (Exhibit C)* | *$ (25,694.00)* |
| | **Subcontract Amount Remaining** | **$ 49,306.00** |
| | | |
| | | |
| | | |
| | Subtotal | $ 43,194.00 |
| | | |
| | | |
| | | |
| | OVERHEAD & PROFIT (0%) | $ - |
| | | |
| | | |
| **Total** | | **$ 43,194.00** |

Owner's Representative: _____                    _____
                                                                                                                Date

Project Manager: _____                              _____
                                                                                                                Date

**Ausi Builder - Estimate**

21 S 32nd St., Phoenix, AZ 85034

Phone: (480) 516-6454          Email: ausibuilders@gmail.com

**Reference: Valvoline - 1864 E Baseline RD., Mesa, AZ 85204**                                    **11/3/2021**

Client:    Cloud Construction / CO Parker Cook
Property:  3101 Cobb PKWY., Ste 124
         Atlanta, GA 30339

We are respectfully submitting this estimates for the electrical at the above-listed property. All field measurements are verified. The scope of the work is per the approved set of plans under PMT20-10729 PER the following line items.

| Description | Total |
|---|---|
| **Labor:** to install all of the EMT and Metal Boxes, install all of the SES, panel (LP), and panel (LPA) and all of the electrical and related wiring per plans. Phone terminal grounding and 3 light poles grounding.  Also, provide an excavator to dig 18" wide x 36" deep trench for a 2-1/2" sleeve as required by the electrical company from the main transformer to the light poles and the main SES feeder line.  **8 weeks at 40 hrs. X 4 technicians.** | $           44,800.00 |
| **Materials:**  SES panel, Panel LP, and Panel LPA per plans. All wires, all of the lighting interior package, exterior lighting package, 3 poles, 2 sensors for well pumps. All of the power, outlets, switches, disconnect panels, photo lens sensors. **Scissor's Lift and Excavator Rental fees are included.** | $           40,200.00 |
| **Low Voltage:** All materials and labor to run EMT conduits and metal boxes for low voltage and CAM EMTs. The low voltage wiring and equipment installation is provided by others. . **Estimated Labor and Materials.** | $             7,500.00 |
| **Grand Total** | $           92,500.00 |
| **Notes: All work is warranted for 2 years of completion date.** | |
| **This estimate is valid for 14 days only. Building materials prices are very unstable and are increasing rapidly. This estimate is for the finish build up only and it does not include the future tenant's equipment's installation.** | |
| **EXCLUDED: The caissons and concrete footings for the light pole, the concrete pad for the transformer and the signs. Any additional work outside of this agreement shall be completed with a pre-approved change order.** | |

**Authorization**

_____                                    _____

**Authorization Signature**           **Date**          **Steve Ausi**

## Standard Form of Agreement Between Contractor and Subcontractor

| Project Information ("Project") | |
|---|---|
| Project # | 17120 |
| Title Owner | Valvoline – Mesa |
| Address | 1864 East Baseline Road |
| City, State, Zip Country | Mesa, AZ 85204 |

| Contract Information | |
|---|---|
| Contract # | 17120-008 |
| Issue Date | 20-January-2021 |
| Subject | Electric |
| Retainage Percentage (10%) Work 10 % | Stored Mat'l.   10% |

| Issued By ("Contractor") | |
|---|---|
| Contact | Ben Dixon |
| Company | Cloud CM, LLC |
| Address | 3101 Cobb Pkwy, Ste 124 |
| City, State, Zip | Atlanta, GA 30339 |
| Country | USA |
| Phone | 678-669-3639 |
| Email | bdixon@thecloudcm.com |

| Subcontractor | |
|---|---|
| Contact | Alex Semerjian |
| Company | Star Electric Service |
| Address | 1522 Lynglen Dr. |
| City, State, Zip | Glendale, CA 91206 |
| Country | |
| Phone | 818-424-3200 |
| Email | starelectricservicesinc@gmail.com |

**Article 1.   Scope of Work**

**1.1**   Subcontractor hereby agrees with Contractor to furnish all **labor, material, equipment, and proper supervision** for all work to be as described and reviewed per this contract, existing onsite conditions, approved construction documents, and all applicable building codes (the "Contract") (Subcontractor and Contractor shall collectively be referred to as "Parties").

**1.2** Per this Contract, Subcontractor agrees that proper and current licensure in the State, City, County, and/or Jurisdiction of said Project, for the work to be performed per this Agreement, is the responsibility of the Subcontractor. Subcontractor agrees that proper and current licensure will remain in effect for the duration of the Project.
**1.2.1.** Additionally, within five (5) business days of executing this Agreement, and prior to mobilizing on-site, Subcontractor shall provide valid documentation to Contractor supporting current and valid licensure, certificates of insurance (see Article 11) and properly completed W-9 form.
**1.2.2.** Finally, if Contractor incurs any repercussions, damages, penalties, and/or fees for Subcontractor's breach of this Contract, Contractor shall be entitled to recovery of those loses or fines from Subcontractor.

**1.3   Scope of Work**

**1.3.1**   Subcontractor agrees, without limitation, to furnish, install, and pay for all materials, labor, supervision, per diem, hotel accommodations, equipment (including, but not limited to cranes, scissor lifts, boom lifts, ladders), tools, safety equipment, transportation (including rental cars), storage, taxes, permits, and everything necessary to fully complete the scope of work, in accordance with the project Contract Documents and Specifications for Valvoline in Mesa, AZ. "Contract Documents" shall be defined as this Contract, any Exhibits hereto, Subcontractor's Payment Applications, Approved Change Orders, and Subcontractor's Submittals as defined below. Subcontractor is responsible for completion of entire Contract Scope of Work, regardless if Subcontractor reviewed and/or priced the contracted work, correctly or incorrectly.

**1.3.2**   Subcontractor is responsible for all "make-safe" activities before start of work.

**1.3.3**   Subcontractor is responsible to furnish, install & coordinate all components for temporary power for the jobsite, including but not limited to temporary power pole. Temporary power should be coordinated with the onsite GC and established within fourteen days of commencement. Subcontractor is responsible to coordinate with the city and local power company, following all codes, when setting up temporary power.

**1.3.4**   Subcontractor is responsible to furnish, install & coordinating exact location & all requirements for underground electrical per plans and specifications.

**1.3.5**   Subcontractor is responsible to furnish and install underground telephone conduits, data conduits and labeled pull strings per plans and specifications, coordinating exact location and all requirements with utility company per plans and specifications.

**1.3.6**   Subcontractor is responsible to furnish and install all conduit and labeled pull strings for all site signage, equipment and internally illuminated signage (interior & exterior), per plans and specifications. Subcontractor is responsible for verifying all requirements with the equipment manufacturer prior to commencing work.

**1.3.7**   Subcontractor is responsible to furnish and install all conduit and boxes for building mount exterior signage, per plans and specifications.

**1.3.8**   Subcontractor is responsible to furnish and install all conduit stubs at light pole bases, all specified feeders and all electrical panels per plans and specifications.

**1.3.9**   Subcontractor is responsible to furnish and install piping and wiring from the transformer location to ensure the primary and secondary service is per plans and specifications.

**1.3.10**   Subcontractor is responsible for verifying all mechanical and plumbing equipment with the mechanical and plumbing contractors prior to installation.

**1.3.11**   Subcontractor is responsible to connect un-switched emergency fixtures ahead of any switches and/or relays according to plans & specifications.

_AS_   **Subcontractor Initials**

## Standard Form of Agreement Between Contractor and Subcontractor

1.3.12   Subcontractor is responsible to install the electrical panels and equipment, including but not limited to MDPs, meter cans, or any other items per plans and specifications.

1.3.13   Subcontractor is responsible to install piping and wiring for the panels, per plans and specifications.

1.3.14   Subcontractor is responsible to furnish and install piping and wiring for the RTU's on the roof, per plans and specifications.

1.3.15   Subcontractor is responsible to furnish and install outlet and switches and cover plates, per plans and specifications.

1.3.16   Subcontractor is responsible to install the owner provided light fixtures, such as Light fixtures, sensors, dimmers, power packs, pole lights, per plans and specifications.

1.3.17   Subcontractor is responsible to furnish installing conduit and boxes for the Voice and Data, per plans and specifications.

1.3.18   Subcontractor is responsible to provide 48-hour notice for GC to schedule survey and staking on site. Survey and staking paid for by GC, however, any repeat trips will be billed to and be the responsibility of the subcontractor.

1.3.19   Subcontractor is responsible for cleaning up all material, trash, tools, any demo material, etc. at end of each shift. Each day the Contractor will assess the clean-up for approval before business operations commence the next morning. In the event that Subcontractor has not upheld a clean workspace the Contractor will issue a 24-hour notice to Subcontractor. If Subcontractor has not completed the required cleanup within the allotted time, the Contractor will clean up Subcontractor's material and shall reconcile all associated fees via back charges.

1.3.20   Subcontractor to coordinate with Contractor and other trades when working in an area to ensure a safe work environment for Owner and other Trades.

1.3.21   Scope of Work includes correcting any rough-in components due to improper placement by this Subcontractor, per the Contract Documents. Subcontractor will be responsible for all cost associated with correcting items not following plan dimensions, key notes, applicable building codes, building standards, and layout.

1.3.22   Subcontractor is to furnish and install all required AUXILIARY material to complete their scope of work including, but not limited to plans and specifications. This includes all material to secure equipment to structure.

1.3.23   Scope of Work includes furnish and installation of all needed material for protection of adjacent surfaces. This includes, but is not limited to, other subcontractors' work or existing conditions. Subcontractor will be held responsible for any back charges and/or repair cost presented, if not upholding to a safe, damage free work environment.

1.3.24   Subcontractor is responsible for all material and labor to properly seal all wall/ceiling/roof penetrations made by this Subcontractor, including, but not limited to, fire caulking, to pass all required inspections for completion of project. Includes maintaining fire rated wall throughout demolition/construction operations.

1.3.25   Subcontractor is responsible for temporarily waterproofing all roof or exterior wall penetrations made by this Subcontractor to ensure the building does not have any water intrusion. Subcontractor will be responsible for all costs associated for a failure to secure/temporarily waterproof any roof or exterior wall penetrations made by Subcontractor.

1.3.26   Subcontractor is responsible for offloading all the equipment, accessories, material, and packaging from Subcontractor supplied and Owner supplied delivery trucks delivering material pertaining to their scope of work. Including, but not limited to, responsibility for supplying and operating equipment to unload material, manpower, unpacking, accessing/noting and reporting any damages to Contractor by the end of the first day material was received. Subcontractor will be held responsible for any damaged items that need to be replaced once inventory has been completed. It is the responsibility of the Subcontractor to verify all material and other furnished items are accounted for and locked up at the end of each day.

1.3.27   Subcontractor shall electronically submit all material via cut/spec sheets for approval, per plans and specifications. Submittals are to be submitted for approval on or before 1/29/21.

1.3.28   Subcontractor shall follow all building management policies and procedures.

1.3.29   Subcontractor shall follow all ADA guidelines drawn out in the construction documents when roughing in and setting fixtures.

1.3.30   Scope of Work includes all applicable permits and associated fees to complete the outlined scope of work of this Contract.

1.3.31   Subcontractor understands this project will require night/weekend work at times to maintain the project schedule, per Exhibit D of the Contract. Subcontractor is responsible for all associated cost to complete scope of work.

1.3.32   Subcontractor is responsible to attend all mandatory jobsite meetings requested by the Contractor. A penalty of $250 will be assessed if the Subcontractor does not have a representative in attendance for any meetings deemed mandatory by the Contractor.

# Standard Form of Agreement Between Contractor and Subcontractor

1.3.33  Subcontractor is responsible for adhering to all OSHA and Contractor safety standards during completion of their Scope of Work. Subcontractor will be held responsible for and indemnifies Contractor against all costs associated to safety citations, delays, including 3rd party fees/cost to reconcile issue.

1.3.34  Subcontractor shall keep a record of their changes that conflict with the original drawings and specifications. At the completion of Subcontractor's Scope of Work Subcontractor shall submit "as-built" prints to the owner and the Contractor.  Subcontractor agrees to submit said "as-builts" prior to Contractor releasing the retainage monies.

1.3.35  Scope of Work includes furnishing all necessary equipment including, but not limited to ladders, scaffold, forklift, scissor lift, crane, etc. to complete Subcontractor Scope of Work for upfit. Includes furnishing all required equipment/manpower to unload/place supplied equipment upon delivery.

1.3.36  Subcontractor is responsible for cleaning up all material, trash, tools, any demo material, etc. at end of each shift. Each day the Contractor will access the clean-up for approval before business operations commence the next morning. In the event that Subcontractor has not updated a clean workspace the Contractor will issue a 24-hour notice to Subcontractor. If Subcontractor has not completed the required cleanup within the allotted time, the Contractor will clean up Subcontractor's material and shall reconcile all associated fees via back charges.

1.3.37  Subcontractor is responsible for adhering to all Government, Client and Contractor COVID regulations, including but not limited to wearing a face mask at all times & staying home if suffering from any symptoms of COVID regardless of diagnosis. Subcontractor must inform the GC if anyone currently working or were working on the job site tests positive for COVID that could have expose others. Subcontractor is responsible for informing the GC of any potential material or supply issues due to the economic effects of COVID.

**Article 2.    Payment Terms**

**2.1 The Total Contract Amount shall be <mark>$75,000.00 (Seventy-Five Thousand Dollars & 00/100) ("Contract Amount")</mark>, subject to authorized additions and deductions as provided herein.** Subcontractor agrees to comply with the following progress payment request requirements:

PROGRESS PAYMENT REQUESTS AND INQUIRIES SHALL BE SENT VIA STANDARDIZED AND FULLY EXECUTED AIA G702 PAY APPLICATION BY EMAIL TO <mark>INVOICES@THECLOUDCM.COM</mark> NO LATER THAN THE 22ND DAY OF EVERY MONTH FOR PAYMENT BASED UPON THE PERCENTAGE OF WORK COMPLETED. SUBCONTRACTOR AGREES THAT IT WILL NOT SUBMIT A PAY APPLICATION PRIOR TO SUBMITTING AN APPROVED SCHEDULE OF VALUES PER SECTION 2.3 BELOW THAT INCLUDES AMOUNTS SUBCONTRACTED TO SUBCONTRACTORS, SUPPLIERS, OR THIRD PARTIES. SHOULD SUBCONTRACTOR FAIL TO PROVIDE A SCHEDULE OF VALUES PRIOR TO SUBMITTING THE PAY APPLICATION, THE PAY APPLICATION SHALL BE REJECTED. ALL WORK AND INSPECTIONS FOR THE PORTION OF CONTRACT REQUESTED MUST BE COMPLETED PRIOR TO THE REQUEST FOR PAYMENT. PAY APPLICATIONS OR RESUBMISSIONS THEREOF SUBMITTED BY THE SUBCONTRACTOR IN ANY METHOD OTHER THAN THE AFOREMENTIONED EMAIL ADDRESS SHALL BE <u>REJECTED</u> AND <u>NULLIFIED</u>

Payment towards Contract Amount shall be subject to inspections.  If Subcontractor is not mandated by local governing building department for inspections, than the onsite Contractor's agent will perform necessary inspection(s) of Subcontractor's completed work before payment will be reconciled

<u>Please note that a CURRENT certificate of General Liability and Workman's Compensation Insurance (refer to Article 11) must be received PRIOR TO ISSUANCE OF first payment and any subsequent payments or PAYMENT REQUEST WILL NOT BE RECONCILED. INTERIM AND/OR FINAL LIEN RELEASES executed by Subcontractor MUST be submitted with Interim/Final Payment request OR PAYMENT REQUEST WILL NOT BE RECONCILED. Meeting these requirements will result in payment terms as stated in Article 2.8. IF THESE REQUIREMENTS ARE NOT MET, PAYMENT request will fall to next pay period.</u>

**2.2 Unit Prices, if any:**

**2.3** Within seven (7) days from the date of this Contract Subcontractor shall prepare and submit to Contractor a schedule of values apportioned to the various divisions or phases of the Work. Each line item contained in the schedule of values shall be assigned a monetary price such that the total of all items shall equal the Contract Amount.  All amounts subcontracted to other subcontractors, suppliers, or third parties shall be specifically identified and assigned a monetary price within the schedule of values (the "Schedule of Values").

**2.4** From each progress payment made prior to substantial completion the contractor may retain ten percent (10%) of the amount otherwise due after deduction of any amounts as provided in Article 2.5.

**2.5**  The Contractor may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may be reasonably necessary to protect Contractor from loss or damage based upon the following: the sub contractor's failure to perform the work as required by the Contract Documents, loss or damage arising out of or relating to this agreement and caused by the Subcontractor, defective work not corrected in a timely fashion, reasonable evidence of delay in performance of the work such that the work will not be completed within the scheduled time, reasonable evidence demonstrating that the unpaid balance of the Contract is insufficient to fund the cost to complete the work.

**2.6**  Subcontractor shall be entitled to no deposits for labor and shall be entitled to material deposits only as mutually agreed and identified before entering into this Contract, and specifically identified in the payment terms of this Contract.

**2.7** Subcontractor shall submit, as an exhibit to each Pay Application submitted per Section 2.1 above, a complete list of subcontractors, vendors, suppliers, and other 3rd party vendors (Exhibit F) to be paid with the funds requested in Subcontractor's Pay Application and each third parties' respective workers compensation certificate of insurance naming Contractor as an "additional insured." Refusal to submit the complete list per this Section 2.7 may result in Contractor's rejection of Subcontractor's Pay Application. Subcontractor is solely responsible for payments to all vendors, suppliers and subcontractors used in the performance of this Contract and hereby indemnifies Contractor for any and all third-party claims by vendors, suppliers, and subcontractors of Subcontractor. It is not the intent of the Contractor to create third party beneficiary rights in these entities. Subcontractor agrees that Contractor shall have the right to request invoices and other documentation from Subcontractor's subcontractors, vendors, and suppliers. Contractor shall have the right to pay Subcontractor's subcontractors, vendors, and suppliers directly via automated clearing house or joint check, per Article 7 below. In the event Contractor

## Standard Form of Agreement Between Contractor and Subcontractor

is required to pay Subcontractor's subcontractors, vendors, or suppliers directly via automated clearing house or joint check, Subcontractor hereby agrees to execute a deductive change order and any and all other documentation to assist Contractor's direct payment to Subcontractor's subcontractors, vendors, or suppliers.

**2.8** Subcontractor agrees that Subcontractor is paid only if the Contractor is paid for corresponding work. Subcontractor agrees that Subcontractor's request for final payment by Contractor shall follow the requirements listed above in Article 2.1 and require the following **additional documents**: copies of unconditional progress releases from previous payments, conditional final release for retainage amount, warranty letter per Article 12 below, final unconditional lien waivers, all operating and maintenance manuals for materials provided by Subcontractor, any and all reports associated with the Scope of Work, and all approvals of required inspections. The total price paid to the Subcontractor shall be the Contract Price, as detailed in Article 2.1.

### Article 3.    Time of Completion
**3.1** Subcontractor shall keep both an adequate size and properly trained crew on the job site to complete the project within the projected construction project schedule and set forth by Contractor in Exhibit D hereto (the "Construction Project Schedule"). Subcontractor is responsible for advising Contractor of all material lead times, installation requirements or conditions, and typical duration for scope(s) of work so that contractor most accurately schedule and coordinate all scopes of work.

**3.2** If Contractor deems necessary and/or Subcontractor fails to adhere to Article 3.1, a Notice of Default and Request to Cure notice will be issued by Contractor to Subcontractor, addressing failure(s), delay(s), or other default. Upon receiving Notice of Default and Request to Cure, Subcontractor shall have <u>twenty-four (24) hours</u> to respond to Request(s) to Cure included in Notice.  If Subcontractor neglects to respond to and/or complete requested activities within 24 hours, Contractor may supplement or terminate this Contract, as outlined in Article 15.

**3.3** Subcontractor agrees to complete the Scope of Work in a timely manner and in accordance with the attached Exhibit D, the Construction Project Schedule, which may be adjusted at the sole discretion of the Contractor and as actual progression of work dictates. In the event Subcontractor cannot complete the Scope of Work in the attached Schedule, Subcontractor must alert Contractor to any conflicts in the Schedule within seventy-two (72) hours of execution of this Contract. Should Subcontractor fail to alert Contractor of conflicts in the Schedule per the terms of this Article 3.2, Subcontractor shall be responsible for any costs or delays to Contractor arising out of Subcontractor's failure to comply with the Schedule, including delays in work directly or indirectly affected by other subcontractor's scopes of work. Subcontractor shall, upon Contractor's request, supply to Contractor a weekly update on Subcontractor's progress per the Schedule.

**3.4** Should Subcontractor fail to alert Contractor as to conflicts with the Schedule per Article 3.3 above and later requests Contractor to extend time outside of the Schedule to finish its Scope of Work, Subcontractor must notify Contractor in writing on or before seven (7) days of the milestone in the Schedule Subcontractor is unable to meet. If Subcontractor provides notice per this Article 3.4 it shall be within the Contractor's sole discretion to grant such an extension and reserves the right to require Subcontractor to execute a change order reflecting the expansion of the Scope of Work. Should Subcontractor fail to provide notice to Contractor per this Article 3.4 Subcontractor shall be liable to Contractor for delay damages as detailed in Article 9 below, if any. The terms of this Article 3.4 shall supersede any and all oral representations made by Contractor, its superintendents, or other agents on the Project site.

### Article 4.    Exhibits to the Contract
**4.1** The following attached exhibits are made part of this agreement:
1. Exhibit A: Plan Set Valvoline Instant Oil Change, Mesa, AZ, Greenberg Farrow (Architects), dated 08/18/2020 including Revision 1 dated 09/15/2020
2. Exhibit B: Drawing Log; dated 11/10/2020 ("Exhibit A")
3. Exhibit C: Project Construction Schedule 1/21/2021
4. Exhibit D: Change Order Template
5. Exhibit E: Subcontractors/Suppliers/Vendors List ("Exhibit F")
6. Exhibit F: Warranty
7. Exhibit G: Owner Safety & Health
8. Exhibit H: Temp Dewatering Clarification (as applicable)
9. Exhibit I: Revised Geotech Report
10. Exhibit J: TPO Specs - Membrane Roofing (as applicable)

### Article 5.    Change Orders
**5.1** Subcontractor understands and agrees that no change orders, expansions of the Scope of Work, or Contract additions will be made unless Subcontractor submits a written change order ("Change Order") in the form of Exhibit E and Contractor's approval of the Change Order in writing.  No other form of change order or invoicing shall be used or accepted. If any additional work is performed and not covered in this Contract or any subsequent Change Order, Subcontractor proceeds at its own risk and expense.  No alterations, additions, or small changes can be made in the work or method of the performance, without the written Change Order signed by the Contractor and Subcontractor. Price should not be more than the actual cost of Labor, Material and equipment followed by a **maximum mark-up of ten percent (10%)**. Contractor retains the right to request and be provided with supporting documentation from the Subcontractor to fully substantiate Change Order submissions. Change Order work submitted on Payment Applications instead of per this Article 5.1 shall not be recognized or processed by Contractor. Payment subject to an approved Change Order will not be made by Contractor until funds to pay for Change Order are received by Contractor from Owner, per Article 2.8.

### Article 6.    Submittals
**6.1** Subcontractor shall submit to the Contractor for review and approval all shop drawings, samples, product data and similar submittals required by the Contract ("Submittals").  Subcontractor shall submit four (4) identical copies of each physical sample. Subcontractor shall be responsible for the accuracy and conformity of its Submittals to the Contract documents. Subcontractor shall prepare and deliver its Submittals to the Contractor no later than the lead time for the item plus two weeks from the scheduled installation of the item per the attached Exhibit D, or two weeks from the date of this Contract, whichever is sooner, and in a manner consistent with the schedule of work and in such time sequence so as not to delay the performance of the Scope of Work or the work of others. Subcontractor's Submittals shall identify, in writing, for each submittals all changes, deviations, or substitutions from the requirements of the Contract Documents.  Contractor's approval of any Subcontractor submittal shall not be deemed to authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless express written approval is obtained from the architect specifically authorizing such deviation, substitution, or change. Subcontractor shall perform all work strictly in accordance with approved Submittals. Architect's approval does not relieve Subcontractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings.

_AS_ **Subcontractor Initials**

## Standard Form of Agreement Between Contractor and Subcontractor

**Article 7.   Subcontractors & Suppliers**
**7.1** Should Subcontractor choose to engage any other company other than its own forces to perform any work or supply any materials Subcontractor will provide the Contractor with a complete list of all other subcontractors and suppliers used and a copy of Subcontractor's written agreement with all other subcontractors and suppliers in conformance with Exhibit F. As detailed in Article 2, Exhibit F shall be submitted with each Subcontractor Pay Application. Subcontractor agrees to bind every sub and supplier (and require every subcontractor to so bind its subcontractors and material suppliers) to all provisions of this Contract and the Contract Documents. Subcontractor shall identify subcontracted and supplier costs in the schedule of values submitted with this contract and furnish conditional lien releases for all subcontractors and suppliers with each application for payment.

**7.2** Subcontractor shall always maintain proper and competent onsite supervision through their own forces that any of their personnel, subcontracted personnel, and suppliers are on the jobsite. Sole determination of the satisfaction of proper and competent supervision shall belong to the Contractor. In no event shall Contractor pay Subcontractor's other subcontractors and suppliers any amount above the Contract Amount contemplated by this Agreement.

**7.3** In the event Contractor determines in its sole discretion that Contractor is required to pay Subcontractor and its subcontractors, vendors, or suppliers via joint check, Subcontractor agrees to execute a joint check agreement and any and all other documents to facilitate Contractor's payment to Subcontractor and its subcontractors, vendors, or suppliers via joint check. Once the joint check agreement is executed, Subcontractor shall supply Contractor with Subcontractor's subcontractors, vendors, or suppliers' respective invoices, conditional lien releases, and unconditional lien releases upon final joint check payment.

**Article 8.   Clean-Up**
**8.1** By signing this Contract, Subcontractor acknowledges its responsibility for daily jobsite clean-up, including all generated construction debris, drink cans, food wrappers, and/or other trash generated by its work and/or workers, subcontractors, vendors, and suppliers. If deemed necessary by Contractor's superintendent, and only after written warning by the Contractor, Subcontractor will be back charged for appropriate clean-up by withholding clean-up costs from payments.

**8.2** By signing this Contract, Subcontractor acknowledges Contractor has a strict no smoking policy and Subcontractor agrees to comply therewith.

**Article 9.   Delays**
**9.1** If Contractor is delayed at any time in commencement or progress of the Scope of Work caused in part or whole by Subcontractor, Contractor shall be entitled to recover an equitable adjustment to the Contract in the form of liquidated damages for the time lost to the delay. Additionally, if Contractor incurs any losses or fines from the property Owner related to delay or negligence on the part of the Subcontractor, Contractor shall be entitled to complete recovery of those losses or fines from Subcontractor.

**9.2** Time is of the essence in completion of the Project in accordance with the Construction Progress Schedule (Article 4.1.3, Exhibit D). By acceptance of this Contract, Subcontractor acknowledges and accepts its responsibility in meeting his scope(s) milestone date(s) as stated in the Construction Schedule. Furthermore, Subcontractor accepts that any damages and/or losses sustained to the Project, Contractor, or Construction Schedule as result of Subcontractor may result in penalty for those damages and/or losses in the amount of $1,500.00. Subcontractor is to notify the Contractor in writing immediately if at any time or any reason its Scope of Work milestone date(s) detailed in the Construction Progress Schedule will not be met and, if necessary, any supplemental work and all financial obligations required to correct those delays and/or deficiencies will be Subcontractor's responsibility. Subcontractor is to notify the Contractor immediately in writing of any existing conditions found during renovation that will or might result in delay to the Construction Schedule.

**Article 10.   Taxes and Permits**
**10.1**   Subcontractor understands and agrees that he shall be responsible for all taxes, fees and expenses imposed directly or indirectly for its work, labor, material, and services required to fulfill this Contract.  Subcontractor is responsible for all permits pertaining to the law, ordinances, and regulations where the work is performed. This Article 10 shall apply to any and all sales taxes regardless to any conflicting state laws.

**Article 11.   Insurance and Indemnity**
**11.1 Indemnification and Subcontractor's Liability**
Subcontractor hereby assumes the entire responsibility and liability for all Scope of Work, supervision, labor and materials provided under any Change Order issued pursuant to this Contract, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and other things provided by Subcontractor until final acceptance of the entirety of the Scope of Work by Owner. In the event of any loss, damage or destruction thereof from any cause, Subcontractor shall be liable therefor, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost, subject only to the extent that any net proceeds are payable under any builder's risk property insurance that may be maintained by Owner or Contractor, if any. Subcontractor shall be liable to Contractor for all costs Contractor incurs as a result of any failure of Subcontractor, or any of its suppliers or subcontractors of any tier, to perform Subcontractor's Scope of Work and other obligations per this Contract.

To the fullest extent permitted by law, Subcontractor shall indemnify, defend, and hold harmless Contractor, Owner and their respective officers, directors, employees and agents ("Indemnified Parties") from and against all claims, damages, costs, demands, losses, expenses, fines, causes of action, suits or other liabilities, (including all costs reasonable attorneys' fees, consequential damages, and punitive damages), arising out of or resulting from, or alleged to arise out of or arise from, the performance of Subcontractor's Scope of Work under the Contract by Subcontractor or its subcontractors, suppliers, and vendors, and Subcontractor's obligations under this Contract, and any Change Order whether such claim, damage, demand, loss, cost, or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to injury to or destruction of tangible property, including the loss of use resulting therefrom; but only to the extent attributable to the negligence of Subcontractor or any entity for which it is legally responsible or vicariously liable and, regardless whether the claim is presented by an employee of Subcontractor. Such indemnity obligation shall not be in derogation or limitation of any other obligation or liability of Subcontractor or the rights of the Contractor contained in this Contract or otherwise. This indemnification shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Subcontractor under any workers' compensation acts, disability benefits acts or other employee benefits acts and includes any loss or injury suffered by an employee of the subcontractor. This indemnification shall be in addition to any indemnity liability imposed by the Contract Documents and shall survive the completion of the Scope of Work or the termination of the Subcontract.

Subcontractor's assumption of liability is independent from, and not limited in any manner by, Subcontractor's insurance coverage obtained pursuant to Article 11.2 or otherwise.

_Subcontractor Initials_                                                                 **Page 5 of 8**

# Standard Form of Agreement Between Contractor and Subcontractor

**11.2 Subcontractor's Insurance**

Prior to commencing the Work, Subcontractor shall procure, and thereafter maintain, at its own expense, until final acceptance of the Work or later as required by the terms of the Subcontract or any individual Work Order, insurance coverage required by the Contract Documents and this Contract. At a minimum, and subject to modification in individual Change Orders, the types of insurance and minimum policy limits specified shall be maintained in a form and from insurers acceptable to Contractor as set forth below. All insurers shall have at least an A- (excellent) rating by A.M. Best and be qualified to do business in the state where the project is located.

This insurance will provide a defense and indemnify the Contractor, but only with respect to liability for bodily injury, property damage and personal and advertising injury caused in whole or in part by Subcontractor's acts or omissions or the acts or omissions of those acting on Subcontractor's behalf.

Proof of this insurance shall be provided to Contractor in the form of a certificate of insurance before the Work commences, as set forth below. To the extent that Subcontractor subcontracts with any other entity or individual to perform all or part of Subcontractor's Work, Subcontractor shall require its subcontractors to furnish evidence of equivalent insurance coverage in the form of a certificate of insurance, in all respects, terms and conditions as set forth herein, prior to the commencement of work by Subcontractor's subcontractor. In no event shall the failure to provide this proof, prior to the commencement of the Scope of Work, be deemed a waiver by Contractor of Subcontractor's or Subcontractor's subcontractor insurance obligations set forth herein.

In the event that the insurance company(ies) issuing the policy(ies) required by this exhibit deny coverage to Contractor, Subcontractor or the Subcontractor's subcontractor will, upon demand by the Contractor, defend and indemnify the Contractor at Subcontractor's or Subcontractor's subcontractor expense.

**Commercial General Liability Insurance**
$1,000,000 Each Occurrence Limit (Bodily Injury and Property Damage)
$2,000,000 General Aggregate per Project
$2,000,000 Products & Completed Operations Aggregate
$1,000,000 Personal and Advertising Injury Limit
**Business or Commercial Automobile Liability Insurance**
$1,000,000 combined single limit per accident
**Workers' Compensation and Employers' Liability Insurance**
$100,000 Each Accident
$100,000 Each Employee for Injury by Disease
$500,000 Aggregate for Injury by Disease
**Excess or Umbrella Liability**
$1,000,000 occurrence/aggregate

Contractor and Owner, along with their respective officers, agents and employees, shall be named as additional insureds for Ongoing Operations and Products/Completed Operations on the Subcontractor's and any Subcontractor's subcontractor Commercial General Liability Policy, which must be primary and noncontributory with respect to the additional insureds. Prior to commencement of the Scope of Work on any individual Project, Subcontractor shall submit a Certificate of Insurance in favor of Contractor and an Additional Insured Endorsement (in a form acceptable to the Contractor) as required hereunder. The Certificate shall provide for thirty (30) days' notice to Contractor for cancellation or any change in coverage. Copies of insurance policies shall promptly be made available to the Contractor upon request. Should Subcontractor submit a payment application per Article 2.1 above without providing the Certificate of Insurance per the terms of this Article, Contractor reserves the right to reject Subcontractor's payment application. Subcontractor shall continue to carry Completed Operations Liability Insurance for at least three (3) years after either ninety (90) days following Substantial Completion of the Work or final payment to the Contractor on any individual Project, whichever is later. Subcontractor shall carry workers compensation insurance and name Contractor and Owner as additional insureds on said policy regardless of contrary State Law.

It is expressly understood by the parties to this Contract that it is the intent of the parties that any insurance obtained by Contractor is deemed excess, non-contributory and not co-primary in relation to the coverage(s) procured by Subcontractor, Subcontractor's subcontractors or any of their respective consultants, officers, agents, subcontractors, employees or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of the aforementioned may be liable by operation of statute, government regulation or applicable case law.

To the fullest extent permitted by applicable state law, a Waiver of Subrogation Clause shall be added to the General Liability, Automobile and Workers Compensation policies in favor of Contractor and Owner, and this clause shall apply to the Contractor's and Owner's officers, agents and employees, with respect to all Projects during the policy term.

**Article 12.   Warranty**

**12.1** Subcontractor shall warranty all labor, materials and equipment furnished on the Project for **(1 year)** against defects in workmanship or materials utilized (the "Warranty"). Subcontractor further warrants for a period of **(3 years)** any defects in workmanship or materials for all asphalt and/or concrete paving provided for Project. The manufacturer's warranty will prevail. No legal action of any kind relating to the Project, Subcontractor's performance or this Contract shall be initiated by either party against the other party after timeframe, mentioned therein, beyond the completion of the project or cessation of work. Neither final building acceptance nor release of final payment shall relieve the Subcontractor or Subcontractor's subcontractors of responsibility for faulty materials or workmanship. Subcontractor's Warranty shall conform with the warranty template attached hereto as Exhibit G.

**Article 13.   Final Completion**

**13.1** When final completion has been achieved, the subcontractor shall prepare for the Contractor's acceptance a final application for payment in compliance with Article 2.7, stating that to the best of subcontractor's knowledge, and based on the Contractor & Owner's inspections, the work has reached final completion in accordance with the Contract Documents. "Final completion" shall be defined as the Project obtaining a certificate of occupancy. Subcontractor must complete punch list items sent by Contractor to Subcontractor within fifteen (15) days of receipt. Should Subcontractor fail to complete the punch list items within the 15 days, and since it is difficult to determine the value of the cost of Subcontractor's delay, Subcontractor shall be liable to Contractor for liquidated damages in the amount of $1,500.00 per day after the 15th day from Subcontractor's receipt of the punch list.

**13.2.** Final payment of the balance of the Contract Price shall be made to Subcontractor within thirty (30) days after final payment is received by Contractor from the Owner and Subcontractor has submitted to Contractor a complete and accurate application for final payment and the following submissions in accurate and fully executed forms where applicable:

**_Subcontractor Initials_**                                                                 **Page 6 of 8**

## Standard Form of Agreement Between Contractor and Subcontractor

1. an affidavit declaring any indebtedness connected with the Work, e.g., payrolls or invoices for materials or equipment, to have been paid, satisfied, or to be paid with the proceeds of final payment, so as not to encumber the Owner's property.
2. as-built drawings, manuals, copies of warranties, and all other close-out documents required by the Contract Documents.
3. release of any liens conditioned on final payment being received.
4. consent of any surety, if applicable.
5. a report of any accidents or injuries experienced by the subcontractor or its subsidiaries at the worksite.
6. copies of unconditional progress releases from previous payments.
7. conditional final release for retainage amount; and
8. warranty letter per Article 12.

This Article states that final payment constitutes a waiver of all claims by the Constructor, except those reserved in writing or relating to liens, defective work, warranties, or latent defects.

**Article 14.    Hazardous Materials, Waste and Asbestos**
**14.1** Both Parties agree that dealing with hazardous materials, waste or asbestos requires specialized training, processes, precautions, and licenses. Therefore, unless the scope of this agreement includes the specific handling, disturbance, removal or transportation of hazardous materials, waste, or asbestos, upon discovery of such hazardous materials the Subcontractor shall notify the Contractor immediately and allow the Contractor to contract with a properly licensed and qualified hazardous material contractor.

**Article 15.    Default and Termination**
**(a)** Subcontractor shall be in default of this Agreement if, at any time, should Subcontractor, in the sole opinion of the Contractor, refuse or neglect to supply a sufficient number of properly skilled workmen (including without limitation, failure to supply such workmen due to strikes, picketing, slowdowns or any labor dispute), equipment and/or materials in proper quality or quantity, or fail in any respect to prosecute Subcontractor's Scope of Work in strict compliance with the Contract Documents or any separate portion thereof with promptness and diligence, or fail in the performance of any of the agreements on its part contained herein, or become insolvent or any bankruptcy or receivership petition is filed by or against Subcontractor, Contractor may, after twenty-four (24) hours written notice to cure to Subcontractor of such refusal and neglect, provide any such labor or materials and/or terminate Subcontractor's right to proceed with Subcontractor's Scope of Work or such part of Subcontractor's Scope of Work, and deduct the cost thereof from any money due or thereafter to become due Subcontractor under this Contract.
**(b)** As of the time of termination, General Contractor shall take immediate possession of the Subcontractor's materials & equipment on the subject project site and stored materials notated on prior applications for payment which are stored offsite. Contractor may finish Subcontractor's Scope of Work by whatever method Contractor may deem expedient, including, without limitation, the hiring of another subcontractor or subcontractors as Contractor may deem advisable. In such event, Subcontractor shall not be entitled to receive any further payment until Subcontractor's Scope of Work is finished and if the unpaid balance of the amount to be paid under the provisions of this Contract shall exceed all costs and expenses incurred by Contractor of finishing Subcontractor's Scope Work plus such other costs and damages as Contractor may suffer by reason of such failure on Subcontractor's part, such excess shall be paid to Subcontractor; however, if such expense, costs and damages exceed such unpaid balance, Subcontractor and its sureties, if any, shall be liable for and shall pay Contractor such difference promptly. Subcontractor acknowledges that it is reasonable for Contractor to employ a reputable substitute contractor upon a cost-plus or time and material basis to complete Subcontractor's Scope of Work that has been partially performed and that substitute contractor may charge Contractor a premium for the time-constraints on completing Subcontractor's Scope Work within the original timeframe and Schedule of the Scope of Work.
**(c)** In addition to and without waiving any other provision in the Contract, Contractor may, without cause, order Subcontractor in writing to suspend, delay, interrupt, or terminate Subcontractor's Work in whole or in part for such period of time as Contractor may determine. In the event Contractor orders a suspension or termination, the Contractor may make an equitable adjustment of the Contract Schedule and/or Contract Amount.
**(d)** Solely in the event of (c) above, an equitable adjustment shall be made for changes in the Contract Schedule and Contract Total, including profit based upon any change in the cost of performance, caused by the suspension, delay, interruption, and/or termination of Subcontractor's Scope of Work. No adjustment shall be made to the extent: (1) that performance is, was or would have been so suspended, delayed or interrupted by another cause for which Subcontractor is responsible; and (2) that an equitable adjustment is made or denied under another provision of this Contract.
**(e)** Upon termination per this Article 15, Subcontractor shall not return the Project site. In the event Subcontractor needs to retrieve its equipment, tools, or other personal property, Subcontractor must request access to the Project site in writing to the Contractor.

**Article 16. Restrictive Covenants**
**16.1.** During the Non-Solicitation Period (defined below), Subcontractor shall (i) not directly or indirectly call on, solicit or take away, for the purpose of providing labor, materials, or services to Owner that are competitive with Contractor's provision of labor, materials, and services as General Contractor to Owner pursuant to an agreement between Contractor and Owner written or otherwise; (ii) not directly or indirectly call on, solicit or take away, for the purpose of providing labor, materials, or services to other, third-party subcontractors that are competitive with Contractor's agreement with said subcontractors, written or otherwise, regarding the project contemplated herein; or (iii) not directly or indirectly solicit any individual employed by Contractor to leave Contractor's employment. For purposes of this Agreement, "Non-Solicitation Period" means that period of time commencing with the Effective Date and continuing through the later of the following two occurrences: (A) twenty-four (24) months from the expiration of the warranty period as contemplated by Article 12 of this Agreement; or (B) twenty-four (24) months from written termination of this agreement between the Parties relating to services to be provided by Subcontractor to Company.

**Article 17. Entire Agreement**
**17.1.** The Parties agree that the terms of this Contract are the full and final expression of the Parties' agreement, that any and all communications, warranties, representations, negotiations, discussions, and agreements, oral or written, are fully integrated into the terms of this Contract. The Parties further agree that the terms of this Contract reflect the entire agreement between the parties and that a court should exclude parole and extrinsic evidence if a dispute arises regarding this Contract.

**Article 18.    Dispute Resolution and Attorney Fees**
**18.1**  In the event of any arbitration or litigation relating to the Project, Subcontractor's project performance or this Contract or Scope of Work, the prevailing party shall be entitled to reasonable attorney fees, costs, and expenses.

**18.2**  The Parties agree that any dispute arising out of or related to this Contract, or the breach thereof, including any and all actions filed by Contractor to remove improper liens filed on the Project by Subcontractor, the Parties consent to the jurisdiction and venue of the courts or arbitrator located in Cobb County, State of Georgia.

_Subcontractor Initials_

## Standard Form of Agreement Between Contractor and Subcontractor

**Article 19.    Force Majeure**

**19.1** In no event shall Contractor be responsible or liable for any failure or delay in the performance of its obligations hereunder, including payment, arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, earthquakes, fire, flood, explosion, or other natural forces, strikes, work stoppages, accidents, acts of war, terrorism, military disturbances, nuclear or natural catastrophes, acts of God, pandemic, governmental action, loss of malfunctions of utilities, loss of communications or computer services; it being understood that Contractor shall use reasonable efforts which are consistent with accepted practices in the construction industry to resume performance as soon as practicable under the circumstances. Contractor shall, as soon as reasonably practicable after the occurrence of any such event, provide written notice to Subcontractor, email shall suffice, of the nature and extent of any such Force Majeure condition. The written notice shall include, at Contractor's option, Contractor's decision to delay the performance of its obligations hereunder, including payment, or to terminate this Agreement.

**Article 20.    Acceptance**

20.1   Contractor retains the exclusive right to assign or convey its portion of this agreement to another entity without prior written notice or consent by the Subcontractor. In such event, Subcontractor and assignee shall continue with performance of the work without interruption, pursuant to the mutual obligations noted herein and as otherwise amended hereafter by a fully executed change order by both parties.

**Documents**

Included in the Contract are the following documents:

| Item No. | Date | Description | Pages |
|----------|------|-------------|-------|
|          |      |             |       |

**Schedule of Values**

Included in the Contract are the following schedule of values:

| Item No. | Description | Quantity | Units | Unit Price | Total Price |
|----------|-------------|----------|-------|------------|-------------|
| 1        | Electric    | 1        | LS    |            | $75,000.00  |

Subtotal = $75,000.00
Tax = N/A
Total = $75,000.00

**This document, when fully executed, as accepted, shall constitute authorization to proceed with the work described herein.**

Subcontractor:                                          Response:   ☒ Accept      ☐ Do Not Accept

Star Electric Services
Company

By    Alex Semerjian          Date  1/20/21                                     Date  1/25/21

_____  *Subcontractor Initials*

# APPLICATION AND CERTIFICATION FOR PAYMENT

Produced by Document G702

Page 1 of 2 pages

**To (Contractor):**
Viva CM, LLC
East Coast Freeway Suite 114, Atlanta, Georgia 30331

**From (Subcontractor):**
Star Electric Services, Inc

**Project:**
Valentine, Mesa AZ

**Arch Next:**

**Application No:**

**Period to:**

**Contract Date:**    9/30/2021

4

**Distribution To:**
Contractor

**Contract For:** Electrical Work

## Contractor's Application for Payment

| C.O. Number | Date Approved | Additions | Deductions |
|---|---|---|---|
| 1 | 1/27/21 | $3,200.00 | |
| 2 | 8/19/21 | $15,000.00 | |
| | | | |
| | | | |
| | | | |
| | Totals | $17,200.00 | $0.00 |
| Net change by Change Orders | | | $17,200.00 |

The undersigned Subcontractor certifies that to the best of the Subcontractor's knowledge information and the belief the Work covered by this application for Payment has been complete in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous certificates for Payment were issued and payments restricted from the contractor, that current payment shown herein is now due.

**Contractor:**  Alex Samarilas

**By:**

**Date:**   10/4/2021

State Of: _____ County Of: _____

Subscribed and sworn to before me this 8th day of October, 20 1A

Notary Public _____

State of California, County of Los Angeles
on this 8 day of October, 20 21
by Alex Samarilas,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Mar. 21, 25

My Commission expires: Subscribed and sworn to (or affirmed) before me
Signature: _____

**Application is made for Payment, as shown below, in connection with the Contract**
Continuation sheet AIA Document G703 is attached.

| | | |
|---|---|---|
| 1. Original Contract Sum | | $75,000.00 |
| 2. Net Change by Charge orders | | $17,200.00 |
| 3. Contract Sum to Date | | $92,200.00 |
| 4. Total Complete & Stored to Date (Column G on G703) | | $43,680.00 |
| 5. Retainage: | | |
| a.    10%    of Completed Work (Columns D+E on G703) | $4,368.00 | |
| b.    10%    of Stored Material (Column F on G703) | $0.00 | |
| Total Retainage (Line 5a + 5b or | $4,368.00 | |
| Total in Columns I of G703) | | $4,368.00 |
| 6. Total Earned Less Retainage (Line 4 less Line 5 total) | | $39,312.00 |
| 7. Less Previous Certificates for | | |
| Payment (Line 6 from Prior Certificate) | | $39,840.00 |
| 8. Current Payment Due | | $39,960.00 |
| 9. Balance to Finish, Plus Retainage | | $47,320.00 |
| (line 3 less Line 6) | | |

## Certificate for Payment

In accordance with the Contract Documents, based on on-site observation and the data comprising the above application, the Subcontractor certifies to the Contractor that to the best of the Subcontractor's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Subcontractor is entitled to payment of the amount certified.

**Amount Certified** ................................................. $39,960.00

(Attached explanation if amount is certified differs from the amount applied for.)

LILT TONYAN
COMM. #2352572
Notary Public · California
Los Angeles County
My Comm. Expires Mar 21, 2025
NRO¹
FOUN

# CONTINUATION SHEET

Document G703 APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's Signed. Certification is attached.
In Tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

Document G703

PAGE 2 OF 2 PAGES

APPLICATION NUMBER:
APPLICATION DATE: October 8, 2021
PERIOD TO: September 30, 2021

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | PERCENT (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE AMOUNT |
| 1 | Electrical Contract | $73,000.00 | $27,680.00 | $20,000.00 | | $47,680.00 | 65.31% | $27,340.00 | $4,768.00 |
| 2 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 3 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 4 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 5 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 6 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 7 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 8 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 9 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 10 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 11 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 12 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 13 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 14 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 15 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 16 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 17 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 18 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 19 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 20 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| | **Total Original Contract Sum** | $73,000.00 | $27,680.00 | $20,000.00 | $0.00 | $47,680.00 | 65.31% | $27,340.00 | $4,768.00 |
| | Change Orders: | | | | | | | | |
| 1 | CO1 | $7,200.00 | $2,200.00 | $0.00 | | $7,200.00 | 100.00% | $0.00 | $220.00 |
| 2 | CO2 | $12,000.00 | $0.00 | $0.00 | | $0.00 | 0.00% | $12,000.00 | $0.00 |
| 3 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| 4 | | | | | | $0.00 | #DIV/0! | $0.00 | $0.00 |
| | **Total Change Order Amount** | $17,200.00 | $2,200.00 | $0.00 | | $7,200.00 | 12.79% | $16,000.00 | $220.00 |
| | **Grand Totals** | $92,200.00 | $29,880.00 | $30,000.00 | $0.00 | $56,860.00 | 54.08% | $42,340.00 | $4,988.00 |

EXHIBIT 5

December 14, 2021

**BY HAND DELIVERY, CERTIFIED MAIL, AND FEDEX OVERNIGHT**

Lee Carroll
Cloud CM, LLC (Construction Management)
3101 Cobb Parkway #124
Atlanta, GA 30339

BY CERTIFIED MAIL, FEDEX OVERNIGHT AND ELECTRONIC MAIL
 AND ELECTRONIC MAIL
W. Wesley Hamilton
Great Midwest Insurance Company
800 Gessner, Suite 600
Houston, TX 77024
whamilton@sspins.com

Re:     **Construction Agreement Between Valvoline LLC ("Owner") and Cloud CM, LLC
        ("Contractor") dated October 26, 2020 (the "Agreement")**

        **Notice of Termination**

Dear Sirs:

        I am writing on behalf of Owner regarding the above referenced Agreement in connection with the Valvoline Instant Oil Change Facility Project located at 1864 East Baseline Road, Mesa, Arizona 85204 (the "Project").

        As I described in the Notice of Default dated December 3, 2021 (the "Notice of Defualt"), Contractor is in default of the Agreement pursuant to Section 16 because (1) it has failed, neglected, and refused to perform the Work; and (2) the Work has been unreasonably delayed.

        Since December 3, 2021, Contractor has not made any attempt to cure the defaults described in the Notice of Default or communicated to Owner any plan to attempt to cure such defaults.  Accordingly, without prejudice to any other remedy Owner may have, Contractor is hereby terminated in accordance with Section 16 of the Agreement.

        Contractor shall immediately:

        -   Stop all Work related to the Project;
        -   Remove all equipment not owned or leased by Owner from the Project site;
        -   Coordinate with Owner to secure the premises at the Project, including securely and safely
            storing all materials;

-   Coordinate directly with Owner to transfer possession of the Project, including, but not limited to all keys, Owner-owned and leased equipment and materials (including such equipment stored in Contractor's job trailer), and other items owned or leased by Owner or purchased for the Project;
-   Terminate all existing subcontracts and purchase orders related to the Project;
-   Refrain from entering into any further subcontracts or purchase orders related to the Project; and
-   Take such further actions as may be directed by Owner.

Once the Contractor has secured the premises at the Project and transferred possession of the Project as described above, Contractor and its subcontractors shall immediately vacate the Project and Contractor and its subcontractors shall no longer have access to the Project.

In accordance with the Agreement, Contractor is not entitled to receive any further payments, including but not limited to, payments requested in Application for Payment No. 6, which Owner hereby rejects due to Contractor's termination.

Upon completion of the Project, if the unpaid balance of the Contract Sum shall exceed the expenses of finishing the Work, including compensation for additional managerial and administrative services, such excess shall be paid to Contractor.  If such expenses shall exceed such unpaid balances, the Contractor shall pay the difference to Owner within ten (10) days of written demand.

Owner will pursue recovery of all damages suffered, including, but not limtied to, lost profits related to the significant delay in completing the Project, additional rent paid pursuant to Owner's lease during the delay period, and the additional costs incurred by retaining a replacement contractor to complete the Project.

Sincerely,

Brett Holtegel

cc:  Jerett Vance (JVance@valvoline.com)